1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF PUERTO RICO
2

3    MAXIMO VILLALOBOS, et al.,

4    Plaintiffs

5    v.                                        CIVIL 97-1589 (JAG)

6    NORTH CAROLINA GROWERS
7    ASSOCIATION, INC., et al.,

8    Defendants
     _____

9
                MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
10

11                          I.  Factual Background

12          This matter is before the court on a multifaceted and voluminous motion for partial

13   summary judgment filed by defendants on June 30, 2000.  (Docket No. 115.)  The

14   plaintiffs filed a response to the motion on August 21, 2000.  (Docket No. 141.)

15                 II.  Legal Standard for Partial Summary Judgment

16          The standard for partial summary judgment is identical to that for summary

17   judgment under Federal Rule of Civil Procedure 56(c).  SCHS Assoc. v. Cuomo, 139 F.

18   Supp. 2d 238, 244 (D.R.I. 2001).  For the purposes of summary judgment, the moving

19   party always has the initial burden of showing the absence of a genuine issue concerning

20   any material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Morrissey v. Boston

21   Five Cents Sav. Bank, 54 F.3d 27, 31 (1st Cir. 1995).  Summary judgment is appropriate

22   when the pleadings, depositions, answers to interrogatories, and admissions on file, together

23   with the affidavits, show there is no issue as to any material fact and the moving party is

24   entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  See Celotex Corp., 477 U.S.

25   at 323, 327; Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996); Garside v. Osco Drug, Inc.,

26   895 F.2d 46, 48 (1st Cir. 1990).

27          The court must view the entire record, including the opposing party's probative

28   evidence, in the light most hospitable to the non-moving party, indulging all reasonable

s/cs:to ( // )
attys/pts
in ICMS  9/6/01

CIVIL 97-1589 (JAG)                    2

inferences in that party's favor. <u>United States v. One Parcel of Real Prop. With Bldgs., etc.</u>, 960 F.2d 200, 204 (1st Cir. 1992); <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990). If reasonable minds could differ as to the significance of the evidence, summary judgment should be denied. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-51 (1986); <u>Boston Five Cents Sav. Bank v. Secretary Dep't of Housing & Urban Dev.</u>, 768 F.2d 5, 8 (1st Cir. 1985).

Subsequent to the moving party's fulfillment of its initial showing, the burden shifts to the non-movant to establish the existence of at least one fact issue which is both "genuine" and "material." <u>Griggs-Ryan v. Smith</u>, 904 F.2d at 115; <u>Garside v. Osco Drug, Inc.</u>, 895 F.2d at 48. A factual dispute is "genuine," and precludes the granting of summary judgment, if a reasonable trier of fact could resolve the disagreement in favor of the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 248; <u>United States v. One Parcel of Real Prop. With Bldgs., etc.</u>, 960 F.2d at 204. A "material" fact is one which has the potential to change the outcome of the suit under the governing substantive law, if found favorable to the non-movant. <u>See, e.g.</u>, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 248; <u>Martínez v. Colón</u>, 54 F.3d 980, 984 (1st Cir.), <u>cert. denied</u>, 516 U.S. 987 (1995); <u>United States v. One Parcel of Real Prop. With Bldg., etc.</u>, 960 F.2d at 204; <u>Griggs-Ryan v. Smith</u>, 904 F.2d at 115.

Where the non-moving party will bear at trial the burden of proof of such a "genuine" and "material" fact, it must, in its response, make a sufficient showing establishing the existence of a factual dispute requiring the trier of fact to resolve the parties' differing versions of truth at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 323; <u>First Nat'l Bank of Arizona v. Cities Serv. Co.</u>, 391 U.S. 253, 288-89 (1968); <u>United States v. One Parcel of Real Prop. With Bldg., etc.</u>, 960 F.2d at 204. Failure to do so would mandate the entry of summary judgment. <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 322.

1   CIVIL 97-1589 (JAG)                    3

2

3                        III. Application

4   A) Statute of Limitations

5       The Migrant and Seasonal Agricultural Workers Protection Act (hereinafter AWPA)[1]

6   itself does not provide for a statute of limitations.  In such cases, the courts have

7   traditionally deferred to the most analogous state statute and borrowed its corresponding

8   limitations period. Barajas v. Bermúdez, 43 F.3d 1251, 1255 (9th Cir. 1994); Rivera v.

9   Anaya, 726 F.2d 564, 567 (9th Cir. 1984); Medrano v. D'Arrigo Bros. Co. of California,

10  125 F. Supp. 2d 1163, 1168 (N.D. Cal. 2000).

11      The defendants' first ground for summary judgment is based on their contention that

12  prior to plaintiffs' filing of the complaint, the cause of action had prescribed.  In particular,

13  they argue that plaintiffs' claims arising from the defendants' allegedly misleading and/or

14  false disclosures made during their recruitment period are governed by the three-year

15  statute of limitations of article 1867 of the Puerto Rico Civil Code.  31 P.R. Laws Ann. §

16  5297(3), art. 1867.[2] As an alternative to this proposition, plaintiffs suggest the application

17  of article 1864 of the Puerto Rico Civil Code, which would allow for a fifteen-year statute

18  of limitations for damages arising out of a breach of contract.  31 P.R. Laws Ann. § 5294,

19  art. 1864.[3]

20      Defendants' argument is based on the proposition that the accrual of the three year-

21  time limit should be counted from April 20 , 1994, the day when the recruitment period

22

23  ───────────────

24      [1]Some courts abbreviate the Act as "MSPA" or "MSAWPA."  I adopt the usage in
    Adams Fruit Co. v. Barrett, 494 U.S. 638, 640 (1990).

25      [2]Actions governed by this article are, *inter alia*, those  "(3) [f]or the payment of ...
    laborers the amounts due for their services, and for the supplies or disbursements they may

26  have incurred with regard to the same."

27      [3]Title 31 P.R. Laws Ann. § 5294, art. 1864 reads, in its relevant portion: "those
    [actions] which are personal and for which no special term of prescription is fixed,

28  [prescribe] after fifteen (15) years."

CIVIL 97-1589 (JAG)                    4

ended. To support the applicability of article 1867, defendants cite Aponte Martínez v. Srio. de Hacienda, E.L.A., in as much as the article allows laborers to seek redress as to terms, conditions, and benefits. Aponte Martínez v. Srio. de Hacienda, E.L.A., 125 D.P.R. 610, 623 (1990). The argument omits any reference to the case's holding that this section's statute of limitations does not begin to accrue until the worker ceases to perform services for the employer. Id. at 622. In this case, plaintiffs did not arrive in North Carolina until April 19 and 20, 1994, and did not start to work until after these dates. Thus, even if this article applied, the statute of limitations would not have run until much later than April 20, 1997.

Plaintiffs' alternative position—the application of article 1864's statute of limitations—seems to gather support from the policy underlying the AWPA and from well-established jurisprudence. As to AWPA's policy goals, Congress has made it clear that the driving motivations behind the enactment include the congressional recognition that "[b]ecause of [a] virtually insurmountable wall of economic, social, educational, language, and cultural barriers facing [most migrant and seasonal agricultural workers,] their reliance upon [the farm labor] contractor is extraordinarily heavy, and in many cases, total." See Barajas v. Bermúdez, 43 F.3d at 1253-54. It is imperative that AWPA's provisions be construed broadly so that "the most abused of all workers in the United States," who shift about the country to meet the professed needs of employers who voluntarily use the resources of the federal government, shall amply enjoy the Act's intended humanitarian purposes. See id. at 1260 (citing to H.R. Rep. No. 97-885, at 2, 97th Cong., 2nd Sess. 16, reprinted in 1982 U.S.C.C.A.N. 4547, 4548 (1982)); Aguero v. Christopher, 481 F. Supp. 1272, 1275 (S.D. Tex. 1980). See also Caro-Galvan v. Curtis Richardson, Inc., 993 F.2d 1500, 1505 (11th Cir. 1993). Court decisions thus embody the legislative recognition of the need to "reverse the historical pattern of abuse and exploitation of migrant and seasonal

1   CIVIL 97-1589 (JAG)                          5

2

3
     farm workers[.]" <u>Castillo v. Case Farms of Ohio, Inc.</u>, 48 F. Supp. 2d 670, 675 (W.D. Tex.
4
     1999) (citing to H.R. Rep. No. 97-885, at 3). The application of state law maximizes the
5
     efficacy of the Act's enforcement and accounts for the itinerant reality of migrant workers'
6
     existence, for the likelihood that they will be fearful, intimidated, or unable to assert their
7
     rights within a short time limit, for the potential lack of protection state laws may offer
8
     these workers, and for the significant language and cultural barriers that burden this
9
     increasingly Spanish-speaking labor pool and that are likely to increase the time that it
10
     takes them to find representation. <u>See</u> <u>Barajas v. Bermúdez</u>, 43 F.3d at 1260; <u>Beliz v.</u>
11
     <u>W.H. McLeod & Sons Packing Co.</u>, 765 F.2d 1317, 1332 (5th Cir. 1985); <u>Estados Unidos</u>
12
     <u>Mexicanos v. Decoster</u>, 69 F. Supp. 2d 168, 170 (D. Me. 1999).
13
              Plaintiffs' proposition concerning the applicability of article 1864 is amply supported
14
     by precedent. For instance, in <u>Barajas v. Bermúdez</u>, 43 F.3d at 1259, the court found that
15
     the plaintiffs' claims as to the defendants' false and misleading disclosures of the wage rates
16
     and other terms and conditions of agricultural employment were most analogous to
17
     contract claims. In so doing, the court explicitly chose the longer of two potentially
18
     applicable statutes of limitations, finding that the application of the shorter time period
19
     would have been inconsistent with AWPA's goal to both effectively deter and remedy any
20
     violations. <u>Id.</u> Similarly, the court in <u>Sánchez v. Morrison</u> held that Michigan's six-year
21
     statute of limitation for breach of contract was applicable to plaintiffs' AWPA claims.
22
     <u>Sánchez v. Morrison</u>, 667 F. Supp. 536, 537 (W.D. Mich. 1987). Therein, the court
23
     specifically rejected the defendants' argument that it should apply the three-year statute
24
     of limitations applicable to injuries to a person or property or for violations of the state
25
     minimum wage laws. <u>Sánchez v. Morrison</u>, 667 F. Supp. at 537. It additionally rejected
26
     the notion that, because employers need only keep records for three years to comply with
27
     their AWPA obligations, the limitations period should be set at three years. <u>Id.</u> at 538.
28

CIVIL 97-1589 (JAG)                    6

Likewise, in Marquis v. United States Sugar Corp., the court found that—regardless of a defendant's three-year obligation to keep records under AWPA—the plaintiffs' AWPA claims should be governed by the state's four-year statute of limitations on contracts and obligations. Marquis v. United States Sugar Corp., 652 F. Supp. 598, 602 (S.D. Fla. 1987). Finally, in Sánchez v. Overmyer, the court rejected the application of the two-year statute of limitations of Ohio's Portal-to-Portal Act, which generally applies to an employee's actions for wages. Instead, it provided for the application of Ohio's breach of contract statute of limitations. Sánchez v. Overmyer, 845 F. Supp. 1178, 1179 (N.D. Ohio 1993).

Defendants accurately maintain that, like Ohio, the Commonwealth of Puerto Rico has enacted legislation that generally applies to a laborer's actions for wages and other employment related claims. See 31 P.R. Laws Ann. § 5297(3), art. 1867. While there is no indication that Congress intended the federal courts to adopt a uniform state law borrowing a source for AWPA actions, Barajas v. Bermúdez, 43 F.3d at 1257, the defendants have not provided this court with any valuable reason not to follow the Overmyer court's lead and apply instead Puerto Rico's general breach of contract provision. Though clearly AWPA is a broad network of legal protection that may encompass more than one state law cause of action, Barajas v. Bermúdez, 43 F.3d at 1258, application of the Commonwealth's law must not effectively take away these workers' rights nor render AWPA inaccessible and ineffectual. Nevertheless, regardless of which statute of limitations applies, plaintiffs' complaint is not time-barred. It is therefore unnecessary to determine which of the plausible statute of limitations should apply. I therefore recommend that defendants' motion for summary judgment based on the defense of limitations be DENIED.

B) Written Disclosures

CIVIL 97-1589 (JAG)                     7

AWPA's section 1821 states that "each" "farm labor contractor, agricultural employer, and agricultural association" seeking to recruit any migrant farm worker shall ascertain and disclose certain required information "in writing," accurately, intelligibly, and with particularity to "each such worker" at the time of recruitment. See 29 U.S.C. §§ 1821(a), (f), and (g). Cf. Washington v. Miller, 721 F.2d 797, 801 (11ᵗʰ Cir. 1983) (discussing AWPA's less stringent predecessor, the Farm Labor Contractor Registration Act (FLCRA)). The Act's legislative history unequivocally confirms the import of the statute's plain meaning:  that it was purposefully engineered to grant each and every worker an independent and individual right to receive a written ratification of all of the material terms and conditions of employment and to be intelligibly and comprehensively appraised of his or her prospective working arrangements. See H.R. Rep. No. 97-885, at 14, 15. See also Bueno v. Mattner, 829 F.2d 1380, 1384 (6ᵗʰ Cir. 1987) (every individual worker is independently entitled to a written disclosure of the terms and conditions of employment). When undertaking the evaluation of a statute's construction and appropriate interpretation, the starting point must be the language of the statute. See Brady v. Credit Recovery Co., 160 F.3d 64, 67 (1ˢᵗ Cir. 1998).  In general, statutes should be construed so that no word, clause, sentence, provision, or part is rendered superfluous, meaningless, void, or insignificant, if that result can be reasonably avoided. See Williams v. Taylor, 529 U.S. 362, 404 (2000); United States v. Rodríguez, 26 F.3d 4, 8 (1ˢᵗ Cir. 1994); United States v. Fontana, 948 F.2d 796, 803 (1ˢᵗ Cir. 1991).  Courts should be particularly unwilling to treat statutory terms as surplusage when the term occupies a pivotal place in the statutory scheme. See Babbitt v. Sweet Home Chapter of Communities for a Great Or., 515 U.S. 687, 698 (1995); see also Ratzlaf v. United States, 510 U.S. 135, 140 (1994).

Therefore, these AWPA-required disclosures must necessarily include the place and period of employment, the wage rate, the kinds of crops and kinds of activities each worker

CIVIL 97-1589 (JAG)                               8

would be employed to perform, the housing and transportation arrangements, and the existence of a workers' compensation program or any other employment benefits. See 29 U.S.C. § 1821(a). Though the actual need for these full and comprehensible written disclosures may be greatest for those agricultural employees who are physically unable to verify the conditions of employment before accepting an offer and who must undertake their relocation in reliance of an employer's representations, this right is imperative and unqualified. See H.R. Rep. No. 97-885, at 14.

Both the Act and its congressional record emphasize written disclosures as the only effective means of ensuring that agricultural employers will, to the greatest extent possible, provide each recruit with this information, before the worker actually undertakes his journey. See H.R. Rep. No. 97-885, at 14. To maximize the achievement of this humanitarian goal, the courts have required that farm labor contractors, agricultural employers, and agricultural associations disclose this information not only in a language in which the worker is fluent, 29 U.S.C. § 1821(g), but forthrightly and in a manner understandable to such workers. Cf. De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 239 (7th Cir. 1983) (disclosure, when pertinent, should be written in "understandable" Spanish); Alvarez v. Joan of Arc, Inc., 658 F.2d 1217, 1221 (7th Cir. 1981) (FLCRA).

Accordingly, these disclosure requirements cannot be satisfied by simply publishing or disseminating varying, inaccurate, and/or confusing terms and conditions, leaving the worker to guess which terms are applicable and correct. Cf. Washington v. Miller, 721 F.2d at 801. Neither is there any authorization in the Act for the substitution of written disclosures with oral discussions or interrogations. Even a worker's own purported agreement to waive this requirement shall be void as contrary to our Nation's public policy and welfare. See 29 U.S.C. § 1856. In light of these non-discretionary specifications, a

1    CIVIL 97-1589 (JAG)                          9

2

3
defendant's decision not to comply with the "in written form" requirement as to each such
4
worker would inexorably result in a violation of AWPA.
5
Defendants argue that "the record is clear and uncontroverted that ... NCGA made
6
every effort to advise the workers about the terms and conditions of the [farm] jobs for
7
which it was recruiting ...."[4] and that therefore summary judgment is warranted as to what
8
they allege was their full and proper compliance with all of AWPA's written disclosure
9
requirements. In supporting this argument, defendants direct the court to the NCGA-
10
prepared Job Orders,[5] their Attachments,[6] the Work Rules,[7] and the Agricultural Work
11
Agreement.[8] Defendants thus allege these documents were made available to all plaintiffs
12
at the time of recruitment, and that they contained all the required information accurately,
13
intelligibly, and with particularity.[9]
14
As to the delivery of these documents, the evidence on the record belies defendants'
15
arguments. According to Puerto Rico Department of Labor staff members, only the first
16
page of the Job Clearance Orders—in English—was initially received. See Docket No. 115,
17
Defendants' Memorandum for Summary Judgment, deposition of Mateo Vélez Sánchez,
18
at 23, ll. 16-25; deposition of Lizette Vélez Cordero, at 16, ll. 5-6, 13-14; at 49, ll. 22-23.
19

20          [4]See Docket No. 115, Defendants' Memorandum in Support of Motion for Partial
21    Summary Judgment (hereinafter "Defendants' Memorandum for Summary Judgment") at
      15.
22          [5]See id., Exhibit 1, Job Order No. 7930794 and Job Order 7931086.
23          [6]See id., Exhibit 1.
            [7]See id.
24          [8]See id., Exhibits 1 and 12. Defendants additionally point to the plaintiffs' signing
25    of an "Acceptance of Orientation" letter. This Puerto Rico Department of Labor-prepared
      letter, which was merely used by the local offices as an antecedent to the workers' referral
26    to the NCGA job order, has no evidentiary value as to whether or not defendants delivered
27    the required disclosures.
            [9]The substantive quality of the disclosures is the subject matter of the rest of this
28    report and recommendation.

CIVIL 97-1589 (JAG)                    10

See also Docket No. 141, Plaintiffs' Opposition, Exhibit 5, deposition of Mateo Vélez Sánchez, at 33, ll. 12-16; Exhibit 7, deposition of Lizette Vélez Cordero, at 27, ll. 21-25; at 28, ll. 1-6; at 29, ll. 5-10, 15-17; Exhibit 29, deposition of Alfredo Vargas, at 9, ll. 20-25 (stating that the job order was received from Puerto Rico Department of Labor's central office in English and that the local office had to translate its contents to Spanish); Exhibit 26, deposition of Baudilio Polanco Acevedo, at 80 (stating that his Puerto Rico Department of Labor local office only received the first page of the job order). The job order's terms and conditions of employment were not actually explained to the workers until after they had been "accepted" by the employer—and even then not by any of NCGA's representatives, but rather by Puerto Rico Department of Labor staff. (Docket No. 141.) See Docket No. 115, Defendants' Memorandum for Summary Judgment, deposition of Lizette Vélez Cordero, at 29, ll. 5-10, 15-17. It was also at this point—after they had already been hired by NCGA and were already well on their way to North Carolina—that the workers were exposed to Puerto Rico Department of Labor-prepared Spanish summaries of the job order's first page and work rules. See Docket No. 115, Defendants' Memorandum for Summary Judgment, deposition of Mateo Vélez Sánchez, at 30, ll. 7-17 (initially, Puerto Rico Department of Labor local offices communicated the terms and conditions to the workers orally; only when they are about to leave the country did they provide them with a summary in writing and in Spanish of certain documents); deposition of William Tirado Calero, at 16, ll. 6-10 (stating that the "listing" workers were exposed to at the Aguadilla's local office included only what the first page of the job offer contained); deposition of Alfredo Vargas, at 19, ll. 23-25; at 21, ll. 21-22; at 22, ll. 3-13 (stating that workers received a copy of the job order in English, as well as a summary in Spanish, which included information that they would work with "tobacco or cucumbers, hay and straw," for the hourly rate of $5.38); deposition of Ramón E. Toro Martínez, at

CIVIL 97-1589 (JAG)                    11

16, ll. 10-12; at 22, ll. 14-16; at 25, ll. 19-25; at 39, ll. 12-15 (At the Puerto Rico Department of Labor's Ponce local office, workers were handed a summary of the job order's first page and the work rules in Spanish.). See also Docket No. 141, Plaintiffs' Opposition, Exhibit 4, deposition of Eileen Ramírez Colón, at 33, l. 6 (stating that a summary of these documents, prepared by each local job services office, would have been "shown" to each farm workers); Exhibit 5, deposition of Mateo Vélez Sánchez, at 61, ll. 12-13; Exhibit 20, deposition of Manuel Aponte Rivera, at 12, ll. 22-25; at 13, ll. 1-2 (stating that he was only provided the work rules); Exhibit 26, deposition of Baudilio Polanco Acevedo, at 103, ll. 14-21 (stating that workers were given a summary of the first page of the job offer); Exhibit 29, deposition of Alfredo Vargas, at 24 (where it is unclear from the transcript whether the workers received the Agricultural Work Agreement or the work rules). Even NCGA's Stan Eury, Jr., admits that, prior to NCGA's telephonic interview of plaintiffs, "the workers had not been exposed to the terms and conditions of the job."[10] Rather than immediately making any efforts to transmit any and all of the relevant information to the workers, as required of employers by 29 U.S.C. § 1821, following these interviews, NCGA contends that it attempted to delegate its responsibilities to the Puerto Rico Department of Labor, asking "that [the workers] be exposed to the terms and conditions."[11]

Yet, AWPA is clear in its language and 29 U.S.C. § 1821 does not impose any duties on the Puerto Rico Department of Labor. The defendants' mere placing of the job offer in the clearance order system does not bestow on the Puerto Rico Department of Labor the kind of employment agency ability to recruit workers for a particular job offer that would

---

[10] See Docket No. 141, Plaintiffs' Opposition, Exhibit 1, at 179, ll. 10-15.
[11] See id., Exhibit 1, at 179, ll. 10-15.

CIVIL 97-1589 (JAG)                          12

allow it to contract without consulting NCGA.[12]  See López-Rivas v. Donovan, 629 F.
Supp. 564, 568 (D.P.R. 1986) (absent express, official designation, placement of the job
offer in the clearance system does not enable the employment agency to recruit workers for
particular job offer without consulting the employer).  Clearly, rather than performing
delegated hiring functions, the Puerto Rico Department of Labor's tasks encompassed little
more than simple referral services.[13]  Defendants' attempt to justify their inadequate
business practices, therefore, is meritless.

(i) Written Disclosures:  In a Language Common to Plaintiffs

In their summary judgment motion, defendants admit that it was the Puerto Rico
Department of Labor, and not they, that made "the necessary translations of the Job Orders
into Spanish."[14]  Defendants, however, insist that, because "[t]he DOL regulations
recognize the employer's inability to know where the job orders will be sent in the
interstate clearance system," the regulations accordingly "impose the obligation on the local
recruiting office to disclose the terms and conditions of the job orders in a known language
to the workers.[15]"  Yet, this argument is irrelevant to defendants' obligations under AWPA.

---

[12]See Docket No. 115, Defendants' Memorandum for Summary Judgment,
Deposition of James Tull Hill, III, at 53, ll. 8-14 (where Mr. Hill acknowledges that it was
up to NCGA, not the Puerto Rico Department of Labor, to make the ultimate hiring
determination); deposition of Eileen Ramírez Colón, at 79, ll. 4-7 (stating that defendants
were in charge of selecting the workers); deposition of Alfredo Vargas, at 33, ll. 2-6 (stating
that defendants "decided it right then and there, they would say such and such can go;
there were others who did not qualify"); see also Docket No. 141, Plaintiffs' Opposition,
Exhibit 17, interview between Santos Orellana and Rafael Vélez (where Mr. Orellana states
that he "fill[s] out the interviews and from here I pass them down to my boss ... he is the
one that decides" whether or not to hire the workers).
[13]See 20 C.F.R. § 651.10.  Therein, job referral is defined as "the act of bringing to
the attention of an employer an applicant or group of applicants who are available for
specific job openings[.]"
[14]See Docket No. 115, Defendants' Memorandum for Summary Judgment, at 23.
[15]See Docket No. 115, Defendants' Memorandum for Summary Judgment, at 23.

CIVIL 97-1589 (JAG)                    13

The clear language of AWPA's 29 U.S.C. § 1821 does not impose any duties on Puerto Rico Department of Labor, but rather on each "farm labor contractor, agricultural employer, and agricultural association." Additionally, notwithstanding "the difficulty that may arise in providing some workers who are not fluent in English with the information required under this section," the Department of Labor's failures, if any, shall not be the basis for a defense in an action brought against employers by migrant workers. Cf. H.R. Rep. No. 97-885, at 16.

Defendants contend that they fully complied with the Act's provisions and regulations by transmitting to the Puerto Rico Department of Labor a copy of the job order's first page, although it contained only incomplete information, was arguably not made available to all the Puerto Rico farm workers,[16] and was not furnished in Spanish, "a language common" to plaintiffs, who were not fluent or literate in English.[17] 29 U.S.C. § 1821(g).[18]

---

[16]See Docket No. 141, Plaintiffs' Opposition, Exhibit 20, deposition of Manuel Aponte Rivera, at 12, ll. 22-25; at 13, ll. 1-2 (stating that he was only provided a copy of the work rules, never a copy of the job order); Exhibit 29, deposition of Alfredo Vargas, at 24 (where it is unclear from the transcript whether the workers received the Agricultural Work Agreement or the work rules).

[17] Defendants also argue compliance based on their alleged transmission of a copy in Spanish of the work rules and the Agricultural Work Agreement, although these do not give complete AWPA disclosures.

[18]Title 29 U.S.C. § 1821(g) reads:
The information required to be disclosed by subsections (a) through (c) of this section to migrant agricultural workers shall be provided in written form. Such information shall be provided in English or, as necessary and reasonable, in Spanish or other language common to migrant agricultural workers who are not fluent or literate in English. The Department of Labor shall make forms available in English, Spanish, and other languages, as necessary, which may be used in providing workers with information required under this section.

CIVIL 97-1589 (JAG)                    14

Defendants thus reassert their already rejected "reasonableness" defense, Villalobos v. North Carolina Growers Ass'n, Inc., 42 F. Supp. 2d 131, 138 (D.P.R. 1999), in as much as they insist they had "no prior knowledge that their job order would be filed in Puerto Rico."[19] They reargue their already rejected claim that they cannot be held liable for the deficiencies in their own clearance orders.

Additionally, defendants argue that once they became aware that their job orders had been filed in Puerto Rico, they took "reasonable and necessary steps ... to ensure that the terms and conditions of the job orders were presented in writing, and orally, in Spanish, to plaintiffs at the time of recruitment and prior to their departure to North Carolina."[20]

In asserting this argument, the defendants are invoking language explicitly defined by AWPA's legislative history on the question of translation.    Namely, Congress determined that an agricultural employer should not be held liable for a violation of the Act by his failure to provide the necessary information in writing in a language which is only "the primary language of a small number of workers." H.R. Rep. No. 97-885, at 16-17. The Congressional guidelines provided to measure an employer's "reasonable and necessary" compliance regarding this issue include the number of workers involved, the frequency of hiring workers whose primary language is in question, the provision of language-specific forms by the Department of Labor, and the reasonable steps taken by the employer.  See id.

Since this court rejected these same arguments in Villalobos v. North Carolina Growers Ass'n, Inc., 42 F. Supp. 2d at 137-38, it has been furnished with no reason to depart from its earlier conclusions that there is ample evidence that the defendants knew or should have known that a significant amount of its workers would be native Spanish

---

[19]See Docket No. 115, Defendants' Memorandum for Summary Judgment, at 17.
[20]See id. at 17.

CIVIL 97-1589 (JAG)                        15

speakers, that their clearance order would likely make their way into Puerto Rico, and that simply submitting their clearance order to the Employment and Training Association (ETA) was not enough to satisfy the "reasonable and necessary" AWPA standard. Villalobos v. North Carolina Growers Ass'n, Inc., 42 F. Supp. 2d at 137-38

In its 1999 Villalobos v. North Carolina Growers Ass'n, Inc. decision, the court stated:

> We are unpersuaded by Defendants' claims that they had no idea where their clearance orders were going to be sent. A recent Department of Labor report found that 78% of all farm workers in the United States are of Hispanic origin. It is implausible to believe that Defendants, agricultural contractors and an agent and joint agricultural employer in North Carolina, had no idea that the recruited workers would be largely of Hispanic origin. Additionally, the ETA regulations specifically require that positive recruitment should be conducted in areas with "traditional or expected labor supply ...." Puerto Rico is an area with a "traditional or expected labor supply" for agricultural workers.

Villalobos v. North Carolina Growers Ass'n, Inc., 42 F. Supp. 2d at 137-38.[21]

Similarly, as to the defendants' insistence that their mere submission of the job offer to the ETA clearance system could have somehow relieved them of their AWPA responsibility,[22] the court in Villalobos v. North Carolina Growers Ass'n, Inc. already addressed the fact that the ETA does not enforce AWPA and that the Act's broad scope

_____

[21] Cf. Edwards v. Johnston County Health Dep't, 885 F.2d 1215, 1217 (4th Cir. 1989) (stating that more than 90% of migrant farm workers in Johnston County, North Carolina are non-white).

[22] See Docket No. 115, Defendants' Memorandum for Summary Judgment, at 18, where defendants claim that the "ETA's approval confirms that the Job Orders disclosed the proper terms and conditions of employment, and that there were no deficiencies rendering the Job Orders unacceptable." To support this contention, defendants cite to López-Rivas v. Donovan, 629 F. Supp. at 568, a case not about AWPA, but rather about ETA enforcement of its own regulation.

CIVIL 97-1589 (JAG)                16

and purpose exceeds ETA's limited mandate over employers hiring non-migratory foreign workers.[23] <u>Villalobos v. North Carolina Growers Ass'n, Inc.</u>, 42 F. Supp. 2d at 137.

As to the availability of Spanish-language forms by the Department of Labor, the Department has created Form WH-516, which conveniently translates, side-by-side with the English version, each of the required AWPA information prongs.[24] An agricultural labor contractor willing to comply with its AWPA obligations can readily avail himself of this resource. This form—of which defendants were otherwise aware and otherwise employed—could have easily been accurately completed and provided to the workers, but was not.[25]

---

[23]In addition, given that "[t]he availability of U.S. workers can be tested only if U.S. workers are actively recruited ...," 20 C.F.R. § 655.90(b)(c), a defendant's failure to comply with 29 U.S.C. §1821(g) could directly and inevitably sabotage the established procedures to determine whether or not an employer may be authorized to solicit non-immigrant foreign agricultural workers. This procedure entails a preliminary determination of whether or not there are sufficient able, willing, and qualified United States workers available. 20 C.F.R. § 655.90(b)(1)(A). <u>See also</u> 20 C.F.R. § 655.90(b)(2). Such failure may thus result in the frustration of the purpose of AWPA, its federal regulations, and the Immigration Reform and Control Act (successor to the Immigration and Nationality Act) that United States workers rather than aliens be employed wherever possible. <u>Hernández Flecha v. Quirós</u>, 567 F.2d 1154, 1156 (1ˢᵗ Cir. 1977), <u>cert. denied</u>, 436 U.S. 945 (1978); <u>Elton Orchards, Inc. v. Brennan</u>, 508 F.2d 493, 500 (1ˢᵗ Cir. 1974). <u>See also</u> 20 C.F.R. § 655.102(a).

[24]<u>See</u> Docket No. 141, Plaintiffs' Opposition, Exhibit 25. Yet, even if the Department of Labor had failed to make available such forms, this failure alone could not have been the basis for a defense by any of the defendants. <u>See</u> H.R. Rep. No. 97-885, at 16, 1982 U.S.C.C.A.N. at 4562.

[25]In his deposition, Stanford Eury, Jr., acknowledges that NCGA, using information from the job order, filled out a WH-516 form, which was then posted at the housing facility and provided to each employer to give to any United States applicant for information purposes. <u>See</u> Docket No. 141, Plaintiffs' Opposition, Exhibit 1, deposition of Stanford Eury, Jr., at 118, ll. 19-24; at 119, ll. 14-20.

CIVIL 97-1589 (JAG)                    17

Additionally, the defendants maintain that they fully complied with 29 U.S.C. § 1821 by "conduct[ing] interviews in Spanish with recruited workers."[26]  However, there is no evidence on record that tends to prove that during these interviews the defendants took any reasonable and necessary steps towards disclosing the terms and conditions of employment to the Puerto Rican recruits.  To the contrary, the only transcripts of those interviews that the defendants have produced show that NCGA representatives limited themselves to testing the workers' knowledge of the work rules, asking applicants whether they had checked other offers of employment,[27] and inquiring whether they had worked with, or had any allergies to, tobacco.[28]

Only once did one of NCGA's representatives, Santos Orellana, make time to explain any contractual terms, i.e., the three-quarters guarantee and the fifty percent transportation procedure, to one of the workers, namely, Juan González Gauthier.[29] More representative

---

[26]See Docket No. 115, Defendants' Memorandum for Summary Judgment, at 17.

[27]See Docket No. 141, Plaintiffs' Opposition, Exhibit 17, transcript of telephone interview between Santos Orellana and Manuel Vega García; Jay Hill and Edson Cupeles Rivera; see also Docket No. 115, Defendants' Memorandum for Summary Judgment, deposition of Mateo Vélez Sánchez, at 39, ll. 10-14 (stating that "there is a little discouragement ... in North Carolina, for instance.  Why do you come ... why do you want to come to my farm ... when there are so many farms in the country? And I always objected to that ... always objected to that ... why do you want to come ....")

[28]See Docket No. 141, Plaintiffs' Opposition, Exhibit 17, transcript of telephone interview between Santos Orellana and David Orengo; between Santos Orellana and Rafael Vélez; and between Jay Hill and Edson Cupeles Rivera.  See also Docket No. 115, Defendants' Memorandum for Summary Judgment, deposition of James Tull Hill, III (alias, "Jay Hill") at 44, ll. 17-24 (where he admits that, rather than disclosing terms, he "quizzed" the workers and asked them to explain the terms and conditions of employment).

[29]See Docket No. 141, Plaintiffs' Opposition, Exhibit 17, transcripts of telephone interview between Santos Orellana and Juan González Gauthier.  See also Exhibit 17, transcripts of telephone interviews between Santos Orellana and David Orengo, Alfredo Nazario, Manuel Vega García, and Rafael Vélez; and between Jay Hill and Edson Cupeles Rivera.

CIVIL 97-1589 (JAG)                    18

is the interview between Santos Orellana and Rafael Vélez, during which Mr. Orellana's inquiries and explanations as to the necessary documentation a worker should have received consisted of the following: "Have you been given a sheet of paper where it says what type of work it is ... and this and this and this ... and a whole bunch ... of ... "[30] (court's translation), this just a few moments after Orellana had told plaintiff Vélez that his job was "to make sure that you understand the type of work that you come to perform here, how long the work will last, how much is fifty-percent ... because when you get here you say I was not told that ... I didn't know that I came here ... do you understand?"[31] (Court's translation.)

    While oral disclosures may undoubtedly supplement and enhance the recruitment process and the prospective worker's understanding and familiarization with the specific contractor's employment policies and needs, there is no provision in the Act for the substitution of the delivery of written documentation with oral interviews. See Escobar v. Baker, 814 F. Supp. 1491, 1504-05 (W.D. Wash. 1993).  Moreover, even if such an alternative was permissible, the record shows that the exchanges undertaken during these interviews did not result in the disclosure of AWPA-required information.

    The record does not even support a finding that the defendants ensured the transmission to all plaintiffs of a copy of the Agricultural Work Agreement in Spanish.[32] This document, which is simply a catalogue list of terms, includes the possibility of work in any of about 35 different crops, 10 different paragraphs as to the possible tasks workers

---

[30]See Docket No. 141, Plaintiffs' Opposition, Exhibit 17, transcript of telephone interview between Santos Orellana and Rafael Vélez.
    [31]Id.
    [32]See Docket No. 115, Defendants' Memorandum for Summary Judgment, Exhibit 1; Exhibit 12.  The record, however, seems to indicate that some plaintiffs may have received a summary of the Agreement. See Docket No. 141, Plaintiffs' Opposition, Exhibit 5, deposition of Mateo Vélez Sánchez, at 34, ll. 9-25; at 35, ll. 1-6.

CIVIL 97-1589 (JAG)                    19

could expect, and about 25 different pay rates for different tasks and crops. Such disclosure could not meet the standards of accuracy, clarity, and specificity necessary to comply with AWPA.

In view of the above, I find that the defendants have not made a showing of reasonableness concerning their admitted failure to translate and their failure to transmit the Act's required information in writing, accurately, intelligibly, with particularity, and in Spanish to plaintiffs at the time of recruitment. I therefore recommend that the motion for summary judgment by the defendants in relation to their compliance with this provision be DENIED.

(ii) Written Disclosures: Place of Employment

Title 29 U.S.C. § 1821(a)(1) clearly establishes that the defendants had the inescapable obligation to ascertain and disclose to each prospective migrant agricultural worker the place of employment at the time of recruitment. Defendants, however, allege that they were not required by AWPA or by federal regulation to disclose to each of the Puerto Rican migrant workers the name and location of the grower they would be assigned to. They contend that, because under 20 C.F.R. § 655.106(c), associations may be allowed to transfer workers hired pursuant to a temporary H-2A labor certification among its members, the defendants were exempt from their primary AWPA compliance. Yet, regardless of whether or not they were hired under a job order intended to solicit H-2A workers, plaintiffs' rights as migrant workers and United States citizens cannot be waived or extinguished by any of their own or by any of the defendants' actions. The pertinent federal regulations assert that "[w]ritten agreements do not relieve any person of any responsibility that the person would otherwise have under the Act or these regulations." 29 C.F.R. §§ 500.72(b). Therefore, regardless of NCGA's intentions in filing the job order,

CIVIL 97-1589 (JAG)                    20

the defendants' desire to hire H-2A workers—rather than Puerto Rican United States citizens—would not relieve them of their obligations under AWPA. See 29 U.S.C. § 1856.

Alternatively, the defendants' represent as an uncontested fact that they transmitted to plaintiffs an attachment to the job order "list[ing] the address and phone number for each farming operation to which workers could be referred."[33] There is, however, no evidence in the record as to the receipt by plaintiffs of any such document purportedly attached to these orders.

Finally, the defendants contend that the job order's inclusion of NCGA's post office box address and of the general statement that employment would be located in "various counties in N.C., U.S.A." suffices to fulfill their AWPA obligations.[34] In its 1984 Opinion Letter No. 1577 (WH-524) interpreting AWPA, the United States Department of Labor underscored that the requirement to disclose the place of employment can only be fulfilled by providing information with as much specificity as possible.[35] In terms of the name and address of the employer, this requirement refers to the actual grower employer and to the physical location of the place of employment—including the number, street, city or town,

---

[33]SMOF, ¶ 15. See also Docket No. 115, Defendants' Memorandum for Summary Judgment, at 18-19.

[34]See Docket No. 115, Defendants' Memorandum for Summary Judgment, Exhibit 1; Exhibit 12 (including the Spanish equivalent of "various counties in N.C., USA." —"varios condados en North Carolina, EE.UU.").

[35]United States Department of Labor, Wage and Hour Opinion Letter, Opinion Letter No. 1577 (WH-524), ¶ 31,442 (1984). See Docket No. 141, Plaintiffs' Opposition, Exhibit 8. As long as an agency stays within congressional delegation, it is within its power to make policy choices when interpreting a statute, and such choices and interpretations are entitled to deference by the courts. Arent v. Shalala, 70 F.3d 610, 615 (D.C. Cir. 1995). Moreover, an agency is entitled to an extra measure of deference with regard to factual questions involving technical in its own area of expertise. Adams v. United States E.P.A., 38 F.3d 43, 49 (1st Cir. 1994).

1    CIVIL 97-1589 (JAG)                    21

2

3

4    county, and state—not to a business address or a post office box.[36] According to the

5    Department of Labor, the purpose of these requirements is to appraise each individual

6    worker, at the time of the offer, of all the material conditions of employment important to

7    a worker's meaningful decision as to whether to accept the offer.[37]

8        In his deposition, Stan Eury recognizes that NCGA has tobacco-growing members

9    in four different tobacco belts in North Carolina, the Old Belt, the Middle Belt, the Eastern

10   Belt, and the Border Belt.[38] According to published statistics by the North Carolina and

11   United States Departments of Agriculture, these different tobacco belts have both different

12   planting and harvesting dates.[39] The actual physical location of employment could likely

13   affect a worker's decision to respond to a job order according to his dates of availability and

14   his opportunity to enjoy work for a longer period of time.[40]

15       Based on the Department of Labor's long-standing and persuasive interpretation of

16   29 U.S.C. § 1821(a)(1) and 29 C.F.R. § 500.76(b)(1), I find that neither the mere

17   inclusion of NCGA's post office box address nor the general statement that employment

18   would be located in "various counties in N.C., U.S.A." could have met the required level

19   of heightened specificity mandated by AWPA. Moreover, even if the list of grower

20   members, specifying their names and addresses, had been transmitted to plaintiffs,

21   defendants could not have satisfied the disclosure requirement by simply disseminating a

22       [36]See Docket No. 141, Plaintiffs' Opposition, Exhibit 8, United States Department
23   of Labor, Wage and Hour Opinion Letter, Opinion Letter 31,442, 1984.
         [37]See Docket No. 141, Plaintiffs' Opposition, Exhibit 8, United States Department
24   of Labor, Wage and Hour Opinion Letter, Opinion Letter 31,442, 1984.
         [38]See id., Exhibit 1, Deposition, at 83, ll. 12-22.
25
         [39]See id., Exhibit 9. The Old and Middle Belts have planting times usually starting
26   on May 1; the Eastern Belt, on April 15; and the Border Belt, on May 15. Id. Harvesting
     times for the Old and Middle Belts have usually ended on September 15; for the Eastern
27   Belt, August 25; and for the Border Belt, on September 15. Id.
28       [40]See id., Exhibit 7, at 59, ll. 6-11.

CIVIL 97-1589 (JAG)                          22

directory of employers and then leaving the worker to guess which one he would be finally assigned to. See Washington v. Miller, 721 F.2d at 801. Disclosure to each recruit with as much specificity as possible is necessary to comply with this requirement. For those reasons, even in conjunction with the other documentation, none of the post office box address, the list, and the general statement cure the defendants' violation of 29 U.S.C. § 1821(a)(1) and 29 C.F.R. § 500.76(b)(1).

In view of the above, I recommend that the motion for summary judgment in relation to written disclosures of place of employment be DENIED.

(iii) Written Disclosures: Wage Rates, Type of Crops, and Kinds of Activities

Defendants contend that they fully complied with their AWPA obligations to disclose—"in writing" accurately, intelligibly, with particularity, and in a language common to the plaintiff—the applicable and expected wage rate to "each such worker" at the time of recruitment. See 29 U.S.C. § 1821(a)(2). The pertinent federal regulation, however, provides that the precise wage rate need not be disclosed if it is not ascertainable within the recruitment period. See 29 C.F.R. § 500.75(b) (establishing both a good faith effort duty to ascertain wage rates and a duty to timely disclose them).

In such cases, it becomes the defendant's burden to show that he was unable to determine the precise wage rate despite his good faith efforts to do so. Id.; Alex v. Jasper Wyman & Son, 682 F. Supp. 87, 89 (D. Me. 1988). See also Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 908 (3rd Cir. 1991) (FLSA) (good faith requires that employer have honest intention to ascertain and follow dictates of the Act; fact that employer has broken the law for long time without complaints from employees does not demonstrate requisite good faith) (quoting Williams v. Tri-County Growers, Inc., 747 F.2d 121, 129 (3rd Cir. 1984)). Simply publishing a catalogue list of possible pay rates or disseminating varying, inaccurate, and/or confusing wage lists, which ultimately leave the worker to guess

CIVIL 97-1589 (JAG)                23

which terms are applicable and correct cannot suffice to establish good faith efforts, just as it cannot otherwise comply with AWPA. Cf. Washington v. Miller, 721 F.2d at 801. Rather AWPA requires full disclosure of wage terms in writing such that the workers are able to ascertain the rate at which they will be paid. See Escobar v. Baker, 814 F. Supp. at 1504.

Defendants argue that, to the extent that the job orders identified the wage rate of $5.38 per hour and that they "also explained that in certain crops workers would be paid a piece rate, but never less than $5.38 per hour," their AWPA compliance is undisputed.[41] Even assuming that plaintiffs had received any of the attachments to the job orders' first page, the attachment to the clearance order, which was in English—not a language common to plaintiffs—listed over 25 different crops and over 30 specialized tasks with specialized pay rates.[42] Precedent is clear that such multitudinous enumerations of possibilities do not meet the requirements of heightened specificity demanded by AWPA's 29 U.S.C. § 1821(a)(2).

---

[41]See Docket No. 115, Defendants' Memorandum for Summary Judgment, at 19.

[42]See id., Exhibit 1, Deposition of Ramón E. Toro Martínez, at 16, ll. 10-12; at 22, ll. 14-16; at 25, ll. 19-25; at 39, ll. 12-15. At Puerto Rico Department of Labor's Ponce local office, workers were handed a summary of the job order's first page and the work rules in Spanish. The summary of the job order's first page, however, only stated that the work consists of the planting and recollection of "tobacco" and "vegetables," at the "hourly pay rate" of $5.38, as well as in the reparation of fences and railings and installation and taking down of irrigation systems. Exhibit 11; in San Germán's local office, workers received a summary of the job order's first page which stated the pay rate for tobacco and hay and straw at $5.38 an hour and for cucumbers at $0.70 cents per 5/8 bushel. In the section describing the tasks, it included the recollection of tobacco, and mentioned watermelons and asparagus, without specifying their pay rate. While in Arecibo, workers received a summary of the job order's first page which stated the pay rate for tobacco and hay and straw at $5.38 an hour and for cucumbers at $0.70 cents per 5/8 bushel. However, their tasks as to anything but tobacco were not at all, and those for tobacco were too general, incomplete and inadequate. As to alternative forms of work, it stated that the workers could be hired to do any type of agricultural work.

CIVIL 97-1589 (JAG)                          24

As to the disclosures actually contained in the job orders' first page—or for that matter, in their Spanish-language substitutes, such as the summary or the Agricultural Work Agreement—, these were incomplete, inadequate, and otherwise incapable of satisfying defendants' AWPA obligations to any of the plaintiffs, even for those who actually worked in tobacco and for those who had prior experience in tobacco.[43] See De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d at 237 (affirming district court's finding that workers did not have actual notice, as required under AWPA, from prior experience).

Based on their own admissions on the record, the defendants may not even assert in their defense that, despite their most diligent good faith efforts, the specific wage each worker could expect to receive was not ascertainable within the recruitment period. According to NCGA's own Stan Eury, Jr., the data he, in his official capacity, used to fill out the job orders' wage rate disclosures was obtained from the information provided to the association by each individual grower about the crops each grew and the applicable wage rates per crop and task.[44] Defendant NCGA therefore had to know, at the time the job order was filed, the specific information applicable for each grower, for each crop, and for each task, as well as how many workers were needed by each member, yet inexcusably

---

[43]See Docket No. 115, Defendants' Memorandum for Summary Judgment, Exhibits 1, 11, and 12. Specifically, the job orders' disclosures, as well as those of the summaries, were incomplete since they only provided information concerning the pay rates for tobacco, cucumbers, and hay and straw and information only as to a fraction of the tasks expected of the workers involved in the planting of tobacco. The Agricultural Work Agreement, as well as the Attachment to ETA 790, had it been received by any of the plaintiffs, cannot reasonably meet the AWPA standards since it is simply a catalogue of possibilities that leaves the worker to guess which terms are applicable and correct for himself. See Washington v. Miller, 721 F.2d at 801.

[44]See Docket No. 141, Plaintiffs' Opposition, Exhibit 1, deposition of Stanford Eury, Jr., at 63, ll. 1-4.

CIVIL 97-1589 (JAG)                      25

failed to adopt reasonable and effective business practices in order to comply with their simple AWPA obligations to each plaintiff.

Furthermore, given that the defendants' stated dates of need were listed as March 30 and April 11, the defendants must have known before the workers' April 19 and 20 arrivals which growers were cultivating which crops, what their needs for hand labor were, and thus the pay rate workers could expect.  In failing to ascertain and disclose this information, NCGA disregarded plaintiffs' obvious economic needs and their right to meaningfully and effectively choose where to work, in which crops, performing which tasks, and for whom.[45]

Defendants, whose burden it is to establish their good faith effort to ascertain plaintiffs' wage rates and to timely disclose them, have not carried their burden.  In view of the above, I recommend that the motion for summary judgment in relation to compliance by the defendants with 29 U.S.C. § 1821(a)(2) be DENIED.

(iv) Written Disclosures:  Periods of Employment
        (1) Starting Date of Need
            a. Job Order No. 7930794

The first page of job order No. 7930794 identified the anticipated starting dates of need as March 30, 1994 and April 11, 1994 and the ending date of need as November 1. Plaintiffs, as United States citizens entitled to particular protections under AWPA and the pertinent federal regulations, question whether or not NCGA's stated dates of employment were in fact true and accurate for any of its members, in particular of any of those who grew the crops disclosed:  tobacco, cucumbers, or hay and straw.

Plaintiffs' challenge is partly based on the fact that published statistics by the North Carolina and United States Departments of Agriculture reveal that none of the planting

---

[45]See Docket No. 141, Plaintiffs' Opposition, Exhibit 8, United States Department of Labor, Wage and Hour Opinion Letter, Opinion Letter 31,442, 1984.

1  CIVIL 97-1589 (JAG)                    26

2

3

4  dates for the different tobacco belts found in North Carolina coincides with NCGA's

5  March 30, 1994 stated date of employment.[46]  Moreover, except in one case,[47] the

   defendants' own admissions at their depositions sufficiently support plaintiffs' contention

6  that NCGA's disclosure of these dates of agricultural need was false and misleading, in

7  violation of 29 U.S.C. § 1821(a)(4) and 29 U.S.C. § 1821(f).[48]

8

   _____

9      [46]See id., Exhibit 9.  For reference purposes only, see NCGA's own documentation,
10  which places the beginning of the anticipated work period for cucumbers around May 25
    and for hay and straw, around June 1.  See Docket No. 115, Defendants' Memorandum
11  for Summary Judgment, Exhibit 1.  Only the planting date for asparagus, April 1, identified
    in the Agricultural Work Agreement, coincides with the March 30 date.  See id.  Asparagus,
12  however, was only mentioned as a possibility for those workers who were recruited by the
13  San Germán, Puerto Rico Department of Labor's local office.  See id., Exhibit 11.
        [47]In his deposition, defendant Elbert H. Dixon stated that he asked for the workers
14  for the first of April.  See Docket No. 141, Plaintiffs' Opposition, Exhibit 10, deposition
15  of Elbert H. Dixon, at 32, l. 16.
        [48]In their depositions, defendants Ernest C. Evans, Sr., Rob Farmer, Steven Gray,
16  James D. Johnson, Oscar Wayne Kelly, William D. Lee, T. Morris Murphy, Chester Pilson,
17  and Steven W. Thomas, have represented that —either usually or in 1994— their tobacco
    farm labor needs start within days of April 15.  See Docket No. 141, Plaintiffs' Opposton,
18  Exhibit 10, deposition of Ernest C. Evans, at 17, ll. 8-13; deposition of Ro`, Farmer, at 24,
19  ll. 1-7; deposition of Steven Gray, at 10, ll. 18-22; deposition of James D. johnson, at 23,
    ll. 1-9, 19-22; deposition of Oscar Wayne Kelly, at 18, ll. 17-22; deposition of William D.
20  Lee, at 10, ll. 1-6; deposition of T. Morris Murphy, at 14, ll. 11-12; deposition of T.
21  Chester Pilson, at 19, ll. 15; deposition of Steven W. Thomas, at 11, ll. 22-24.  Others
    defendants, such as Richard Canoy, Sr., John T. Dalrymple, Daniel Lee Nelson, and James
22  Jeffrey Upchurch, have represented that they usually start planting tobacco during the last
23  week of April—toward April 25— through May.  See Plaintiffs' Exhibit 10, deposition of
    Richard Canoy, Sr., at 10, ll. 6-8; deposition of John T. Dalrymple, at 11, ll. 11-23;
24  deposition of Daniel Lee Nelson, at 9, ll. 22-24; deposition of Bruce Robertson, at 10, ll.
25  15-20; deposition of James Jeffrey Upchurch, at 14, ll. 1-2.  Defendant Kerry Venable
    contends that his tobacco planting operations take place between the second and third
26  weeks of April through the second or third week in May.  See deposition of Kerry Venable,
27  at 12, ll. 18-20.  Finally, defendants Kent Bennett, Dean Moore, Terry Neal, Bradford
    Todd Newsome, and Bruce Robertson have represented that they typically start
28  transplanting tobacco around May 1.  See id., Exhibit 10, deposition of Kent Bennett, at

CIVIL 97-1589 (JAG)                    27

NCGA—through the deposition of its president Stan Eury, Jr.—alleges defendants' compliance with AWPA based on the unsupported assertion that the Department of Labor purportedly allows NCGA to write in two different starting dates because it "doesn't materially change the terms and conditions of the job order".[49] Yet, the report by the House of Representatives itself identified among AWPA's driving forces the Committee's " ... doubt on the ability of the Department of Labor to adequately enforce the [Act's] provisions[.]" Regardless of whether or not the Department of Labor, or any of its divisions, properly and effectively enforces any of the obligations of agricultural contractors and employers, AWPA provides that each and every farm labor contractor, employer and association which employs any migrant agricultural worker shall be responsible for the provision of the necessary information. 29 U.S.C. § 1821; see H.R. Rep. No. 97-885, at 14. Additionally, it has been explicitly established that no entity shall be permitted to insulate itself from such duty by hiring or delegating authority to an agent that communicates directly with the migrant workers. See H.R. Rep. No. 97-885, at 14. See also Leach v. Johnson, 812 F. Supp. 1198, 1210 (M.D. Fla. 1992).

Furthermore, once employers and labor contractors have disclosed, to the best of their abilities, their true and expected starting date, along with a required disclosure of the date's tentative nature, they are permitted to go without additionally specifying all of the possible contingencies that may affect the starting date. Cf. Alvarez v. Joan of Arc, Inc., 658 F.2d at 1221. This obligation may be easily met by simply prefacing the date of need with the preposition "about" or by otherwise indicating that the dates are "tentative." Id.

---

12, ll. 22-24; deposition of Dean Moore, at 14, ll. 21-24; deposition of Terry Neal, at 9, ll. 16-20; deposition of Bradford Todd Newsome, at 22, ll. 16-20; Exhibit 51, deposition of Bruce Robertson, at 27, ll. 12-24.

[49]See Docket 141, Plaintiffs' Opposition, Exhibit 1, deposition of Stanford Eury, Jr., at 72, l. 4.

CIVIL 97-1589 (JAG)                    28

The first page of the job orders here in question, however, did not in any way indicate that the starting dates were tentative or contingent on any factors. Neither did it —or for that matter any of the other documents provided to the workers—specify employment opportunities by employer or specify each employer's starting date of need.[50] Yet, defendants have themselves admitted that different growers would have very different labor needs depending on the type of crop grown, the geographical part of the state, and the specific time of the year.[51] Because the association's members grew a wide diversity of crops with an equally diverse array of potential planting and harvesting dates for each crop, starting dates and the expected hours of work would necessarily affect a worker's decision to respond to a job order according to his dates of availability and his opportunity to enjoy work for a longer period of time.

In terms of job order No. 7930794, the defendants' motion for summary judgment as to disclosure of the period of employment "in writing," accurately, intelligibly, and with particularity to "each such worker" at the time of recruitment should therefore be DENIED.

b. Job Order 7931086

_____

[50]On the other hand, the Agricultural Work Agreement did provide a lengthy catalogue list, breaking down the growing period by crop, though it did not do so by employer and was not employee-specific. There is evidence in the record, however, that tends to show that this document was not provided to all the workers and that those who received it only obtained it when they were about ready to leave for North Carolina.

[51]See Docket No. 115, Defendants' Memorandum for Summary Judgment, deposition of Stanford Eury, Jr., at 79, ll. 12-20. Therein Mr. Eury states: "[Different crops] could have varying harvesting methods. Some people may do once over. Some people may pick them twice. Some people may have mechanical harvesting aids, some people may not. Different technologies employed, different crop conditions, a bumper crop versus a very poor crop. And that can vary from geographical state —part of the state year to year."

CIVIL 97-1589 (JAG)                    29

The first page of job order No. 7931086 identified the anticipated starting date of need as June 13, 1994 and the ending date of need as November 1. Without offering any kind of supporting meteorological evidence, defendants' contend that the June 13 date was changed to July 1, 1994 due to unusually cold weather conditions.[52]

Plaintiffs, however, have offered sufficient evidence that, in 1994, the State of North Carolina experienced degrees in temperatures warmer or about the same as other.[53]

Whether or not the defendants were justified in charging the starting date of employment and whether or not they violated 29 U.S.C. § 1822(c) is a genuine issue of material fact. I therefore recommend that the motion for summary judgment as to this issue be DENIED.

(2) Anticipated Hours of Work

As filled out by NCGA,[54] the job order's section 10 on anticipated hours of work specified that the workers could expect employment of 40 hours per week.[55] Defendants never informed plaintiffs, either through documents or during the NCGA interviews, that

---

[52]See Docket No. 115, Defendants' Memorandum for Summary Judgment, at 19; Exhibit 7, where Mr. Harry Lee Wicker, Jr., from the North Carolina Employment Security Commission, stated to the United States Department of Labor that its organization had been informed by NCGA that due to "record cold temperatures in combination with less than average rainfall will delay crop activities requiring hand labor for two weeks."

[53]See Docket No. 141, Plaintiffs' Opposition, Exhibit 3.

[54]It was Stan Eury, Jr.'s function, as well as that of Kenneth W. White, to actually write the clearance orders and check them for accuracy. See Docket No. 141, Plaintiffs' Opposition, Exhibit 1, deposition of Stanford Eury, Jr., at 63, ll. 1-4. The information used in NCGA's process of filling out and submitting the job orders was obtained from the information provided to them by the growers about the number of workers they needed, the crops they grew, and their dates of need. Id. In addition, Mr. White's functions included the dissemination of information concerning the applicable federal and state regulations. See id. at 54, ll. 11-15.

[55]See Docket No. 115, Defendants' Memorandum for Summary Judgment, Exhibit 1.

1   CIVIL 97-1589 (JAG)                    30

2

3
    there would be lengthy periods in which little or no work would be available, even though
4
    defendants admit that they knew, at the time of recruitment, that such periods were
5
    expected and needed to be disclosed.[56]
6
        On the contrary, the deposition of the Puerto Rico Department of Labor's Mateo
7
    Vélez Sánchez supports the idea that workers were mislead into believing they could expect
8
    to work 160 hours a month.[57]  NCGA's alleged misrepresentation as to the quantity and
9
    frequency of work and as to the known possibility that work would become scarce or none
10
    existent at certain points during the season would have thus frustrated the statute's intent
11
    to "ensure that workers [would] to the greatest possible extent have full information about
12
    ... what the conditions [would] be when they arrive[d]."  See H.R. Rep. No. 97-885, at 14.
13

14   _____
         [56]See Docket No. 141, Plaintiffs' Opposition, Exhibit 10, deposition of Bradford
15   Todd Newsome, at 23, (stating that for two to four weeks there would be no work); id.,
     Exhibit 13, deposition of Oscar Wayne Kelly, at 14, ll. 2-19 (there was a period of about
16   three to five weeks when workers had little work to do, when they were not doing the
17   fulltime, 40 hours per week, but rather half of that); deposition of John T. Dalrymple, at
     34, ll. 10-12; at 35, ll. 8-11(after setting the crops, there was a period of four to five weeks
18   when there wasn't enough work for the crew); deposition of Raymond W. Foster, at 16, ll.
19   3-4, 6-9 (for about three to four weeks after planting tobacco, there is not a lot of work to
     do, except for clearing rocks and weeding); deposition of Robert E. Farmer, at 36, ll. 10-22
20   (every year for about two to three weeks after planting tobacco, there is a period of little
21   or no work, when he provides work to the men on chopping bushes around ponds and
     irrigating); Exhibit 51, deposition of Bruce Robertson, at 27, ll. 7-10, 12-14, 19-23; at 28,
22   l. 1 (there would be approximately two weeks of down time after planting and before
23   cultivating, during which defendant Robertson provides nothing to do, because "I am not
     going to make them a job"); Exhibit 52, deposition of T. Morris Murphy, at 42, ll. 9-24,
24   (there were expected periods of about two to three weeks past mid May when there was
25   little or no work.  In 1994, during this period, plaintiff Rafael Vélez worked "at least one
     day" in the hog house.); see also Exhibit 16, deposition of [plaintiff] Edson Cupeles Rivera,
26   at 105, ll. 2-4 (he spent about three weeks without work until he found a job working for
27   a "nursery" for $4.25 an hour, $1.13 less than the guaranteed wage of $5.38 hour).
         [57]See Docket No. 141, Plaintiffs' Opposition, Exhibit 5, deposition of Mateo Vélez
28   Sánchez, at 118, ll. 7-18.

CIVIL 97-1589 (JAG)                    31

Defendants' alleged failure to disclose the anticipated hours of employment may have lead at least some plaintiffs to choose the NCGA clearance order over seemingly shorter job opportunities.[58]    Since AWPA requires, without exception, the written disclosure of this material term of the working arrangement, defendants' disclosure was thus incomplete and inadequate, even as to those plaintiffs who had prior experience in tobacco.  See De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d at 237.  Therefore, I recommend that the motion for summary judgment as to this issue be DENIED.

C) Disparate Treatment

The Immigration Reform and Control Act (1986) codifies certain aspects of the current H-2A (non-immigrant temporary foreign agricultural workers) scheme relevant to the present application of AWPA.[59]  See 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), (b), and 1188.  Under this statutory scheme, agricultural employers who anticipate temporary domestic labor shortages may petition the Attorney General for authorization to utilize non-immigrant temporary foreign agricultural workers.  See 8 U.S.C. § 1188(a)(1); 20 C.F.R. § 655.101; Vega v. Nourse Farms, Inc., 62 F. Supp. 2d 334, 335-38 (D. Mass. 1999) (for a thorough discussion of the H-2A program); see also Donaldson v. United States Dep't. of Labor, 930 F.2d 339, 341-42 (4th Cir. 1991) (discussing the H-2A program).  Prior to the Attorney General's approval, the employer must successfully apply to the Secretary of the United States Department of Labor for certification that (A) there are not sufficient domestic workers who are able, willing, and qualified, and who will be available at the time and place needed and (B) the employment of foreign workers will not adversely affect the

---

[58]See id., Exhibit 17, transcript of phone interview between Jay Hill and Edson Cupeles Rivera (where plaintiff states he believed the NCGA job offer would pay better because it entailed a longer period of employment).

[59]The pertinent H-2A regulations are contained in 20 C.F.R. § 655.90 through § 655.113. Section 655.90(a)(2) sets forth the requirements and procedures for certification by employers seeking H-2A workers.

1    CIVIL 97-1589 (JAG)                    32

2

3

4    wages and working conditions of United States workers similarly employed. See 20 C.F.R.

5    § 655.90.  Absent a showing of both preconditions, a certification shall not issue. See 8

     U.S.C. § 1188(a)(1); 20 C.F.R. § 655.90(b)(2).

6

7        An agricultural employer must submit said application less than 60 days prior to the

8    employer's expected first day of need, along with a "job offer" that sets forth all the

     material terms and conditions of employment, including wages, working conditions, and

9
     benefits.  See 20 C.F.R. §§ 655.100(a)(1), (b); § 655.101(b)(1); § 655.102.  Pursuant to
10
     the Wagner-Peyser Act, 29 U.S.C. § 49 et seq., when the supply of local United States
11
     workers is insufficient, the employer's job offer is used to recruit United States workers
12
     around the Nation through an interstate clearance system. See 20 C.F.R. § 655.101(c)(4).
13
     See also 20 C.F.R. §§ 652.1 et seq. (implementing the Wagner-Peyser Act) and §§ 653.500
14
     et seq. (setting forth the requirements for acceptance and handling of intrastate and
15
     interstate job clearance orders seeking agricultural workers).
16
         Though an employer's recruitment efforts of United States workers need only extend
17
     until the date when the H-2A workers depart for the employer's place of employment,
18
     agricultural employers have certain obligations to United States citizen workers up until
19
     fifty percent of the work contract has elapsed.  See 8 U.S.C. § 1188(b)(b); 20 C.F.R. §
20
     655.103(e) and § 655.105. This obligation, known as the "fifty-percent rule," requires that
21
     an employer provide employment to any qualified United States applicant until fifty
22
     percent of the contractual period of employment in which H-2A workers are utilized has
23
     elapsed.  See 20 C.F.R. § 655.103(e); 8 U.S.C. § 1188(c)(2)(B)(i).  If employment of
24
     United States workers results in the displacement of non-citizen H-2A workers, the
25
     employer is exonerated from his employment obligations to the displaced worker. See 8
26
     U.S.C. § 1188(c)(2)(B)(6); 20 C.F.R. § 655.102(b)(6)(iv) and § 655.103(e).
27

28

CIVIL 97-1589 (JAG)                    33

An exception to the fifty-percent rule allows agricultural associations to "refer or transfer workers among its members," if such referral does not result in the disparate treatment of United States workers. See 8 U.S.C. §§ 1188(c)(3)(B)(iv) and (v); 20 C.F.R. § 655.106(c). Clearly, an association's choice to transfer or refer United States workers does not automatically violate the rights of United States citizens. However, this exception plainly allows for the transfer of H-2A workers—which may, on occasion, be particularly advisable so as to avoid the abovementioned disparate treatment of United States workers. Cf. Vega v. Nourse Farms, Inc., 62 F. Supp. 2d at 337. A preference for the transfer of H-2A workers in order to avoid the detriment of United States citizens' working conditions would be predicated on the pronouncement that the "obvious point" of this H-2A statutory and regulatory framework is to ensure the preferential treatment of United States workers over foreign labor. See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez, 458 U.S. 592, 596 (1982).

At a minimum, the defendants—as AWPA agricultural employers—were bound required  to provide to plaintiffs, and all other United States citizens, "no less than the same benefits, wages, and working conditions which the employer is offering, intends to offer, or will provide to H-2A workers."[60] See 20 C.F.R. § 655.102(a). With regards to the placement of United States workers for working assignments among an association's grower member, plaintiffs have supported their disparate treatment claim on the Department of Labor's determination that

> in situations where employers are successful in recruiting foreign workers from the same communities or the same families in order to place them together at job sites in the U.S. and thereby promote a more stable and positive working environment fostered by mutual support and personal relationship

---

[60]Following Congressional intent, under AWPA and other related statutes, the word "or," when used in the context of a list of activities giving rise to AWPA obligations, should be interpreted as meaning any one or all of the activities listed. Cf. Leach v. Johnson, 812 F. Supp. at 1206.

CIVIL 97-1589 (JAG)                              34

of the foreign workers, failure to provide the same environment for U.S. workers would constitute disparate treatment under the law. Under such circumstances, associations would not be permitted to break up and disperse crews of U.S. workers among different employers.[61]

In such situations, questions may arise as to a defendant's intention to place foreign workers together at job sites in the United States and thereby promote a more stable and positive working environment. However, since under AWPA there is no requirement for specific intent, a defendant will be held liable for the natural consequences of his voluntary acts. De la Fuente v. Stokely-Van Camp, Inc., 713 F.2d at 238 (under AWPA's less stringent predecessor, FLCRA); Rivera v. Adams Packing Ass'n, Inc., 707 F.2d 1278, 1283 (11th Cir. 1983) (FLCRA); Alvarez v. Longboy, 697 F.2d 1333, 1338 (9th Cir. 1983); Alvarez v. Joan of Arc, 658 F.2d at 1224; Campbell v. Miller, 836 F. Supp. 827, 830 (M.D. Fla. 1993); Howard v. Malcolm, 658 F. Supp. at 434-35; DeLeón v. Ramírez, 465 F. Supp. 698, 705 (S.D.N.Y. 1979) (FLCRA). See also Sánchez v. Overmyer, 845 F. Supp. at 1192 (if operating in violation of AWPA is a defendant's normal business practice, violations are considered intentional); Stewart v. Everett, 804 F. Supp. 1494, 1497-98 (M.D. Fla. 1992).

According to plaintiffs, the defendants had the prevailing business practice, regarding their temporary foreign workers from Mexico, of frequently assigning family and friends from the same community to live and work together. Plaintiffs, as United States citizens, would have been entitled to the same working arrangements ultimately provided to the non-immigrant foreign co-workers. See 20 C.F.R. § 655.102(a). Plaintiffs have presented sufficient evidence to substantiate their contention that the defendants knew about their

---

[61]See Docket No. 141, Plaintiffs' Opposition, Exhibit 31, Field Memorandum No. 42-94, "H-2A Agricultural Issues Requiring Special Attention," from Barbara Ann Farmer, Administrator for Regional Management, Department of Labor-ETA, April 13, 1994, attached to fax transmission from Daniel L. Lowry, Regional Administrator (GA), to Stan Eury, President, NCGA, April 15, 1994, at 3, ¶ 4(B)(1)(b)(ii).

CIVIL 97-1589 (JAG)                    35

obligations,[62] that the defendant knew about plaintiffs' desire to remain with family and friends from the same community of origin, and that the defendants had lead the Puerto Rico Department of Labor to believe that such requests would be honored.[63]

[62]Defendants may be found to have intentionally violated AWPA even if they lacked knowledge of the plaintiffs' rights and their obligations. See Leach v. Johnson, 812 F. Supp. at 1208.

[63]According to Eileen Ramírez Colón, she had communicated with Charles Dubosse, from the Department of Labor's Monitor Advocate for Region II in New York State and had expressed certain workers' desires to be placed together. See Docket No. 115, Defendants' Memorandum for Summary Judgment, deposition of Eileen Ramírez Colón, at 140, ll. 1-5; see also Docket No. 141, Plaintiffs' Opposition, Exhibit 4, deposition of Eileen Ramírez Colón, at 82, ll. 1-19; Exhibit 5, deposition of Mateo Vélez Sánchez, at 82, ll. 18-25; at 83, l. 1.    Plaintiff Heriberto Alvarez Rosa, along with five individuals—including three of his brothers and two of his friends—, left together for North Carolina with the intention of working together, having already expressed their desire to be hired as a crew. See Docket No. 141, Plaintiffs' Opposition, Exhibit 45, deposition of Heriberto Alvarez Rosa, at 21, ll. 1-17; at 22, ll. 1-6, 12-14. Plaintiff Efraín Alvarez Rosa, who communicated to NCGA his desire to be assigned with friends and family, was told by a Spanish-speaking NCGA representative that Puerto Rican workers had to be assigned separately. See Docket No. 141, Plaintiffs' Opposition, Exhibit 22, deposition of Efraín Alvarez Rosa, at 59, ll. 1-2, ll. 13-15; at 60, ll. 3-5. Puerto Rico Department of Labor, based on representations of NCGA's Stan Eury, Jr., gave assurances to plaintiffs Santiago López Morales, José Luis López Morales, José Ponce, and Teodoro Cabrera, who were interviewed together, that they would be assigned together once they got to North Carolina.  See Docket No. 141, Plaintiffs' Opposition, Exhibit 5, at 65; Exhibit 38, deposition of Santiago López Morales, at 20, ll. 9-11, 23-25; at 21, ll. 1-2, 10, 8; at 25, ll. 9-11.  Plaintiff David Orengo Pacheco spoke directly with Puerto Rico Department of Labor's Lizette Vélez as a representative of his group—consisting of himself, his brother in law, Miguel Camacho, Manuel Vega, Israel Martínez Aponte, Radamés Pacheco (Mr. Martínez Aponte's brother-in-law), Darwin Pagán (not a plaintiff), and George Acosta (not a plaintiff)—to communicate their wish to be assigned together, which they restated at each of their subsequent meetings. See Docket No. 141, Plaintiffs' Opposition, Exhibit 40, deposition of David Orengo Pacheco, at 53, ll. 8-9, 14-15; at 54, l. 3; Exhibit 41, deposition of Israel Martínez Aponte, at 56, ll. 16-25; at 57, ll. 5-12; Exhibit 42, deposition of George Acosta López, at 20, ll. 9-13; at 21, ll. 7-8, 20-21; at 33, ll. 3-4, 11-12. Puerto Rico Department of Labor staff assured them it would be possible but that, in order to guarantee that their wish would be honored, they needed to reassert their wish to the

CIVIL 97-1589 (JAG)                    36

For instance, on April 15, 1994, five days before the arrival of the Puerto Rican workers, NCGA's Stan Eury, received through fax transmission, a copy of Field Memorandum 42-94 from the United States Department of Labor ETA Regional Administrator Daniel Lowry.[64] Had the defendant lacked knowledge of the law, this Department of Labor transmission would have unequivocally informed NCGA that "[United States] workers have the right to be referred to an employer who has sufficient job opportunities to accommodate the entire group when such an employer exists."[65] NCGA, however, deliberately disregarded the workers' rights, as well as the Department of Labor's mandate. Neither appears to have produced any effect upon the way in which NCGA assigned the Puerto Rican workers when they arrived.[66] Instead, the defendants assumed the position that, since the Puerto Rican workers would reach North Carolina

_____

employers when they got to North Carolina. See Docket No. 141, Plaintiffs' Opposition, Exhibit 41, deposition of Israel Martínez Aponte, at 57, ll. 18-19; at 58, ll. 13-15. Once there, however, the Puerto Rican workers found themselves surrounded by a significant number of police officers, wearing bulletproof vests and yielding guns. See Docket No. 141, Plaintiffs' Opposition, Exhibit 41, deposition of Israel Martínez Aponte, at 66, ll. 4-11; Exhibit 42, deposition of George Acosta López, at 37, ll. 7-25. It was within this context, and having been told twice that NCGA representatives had stated that the groups would not be allowed to stay together, that plaintiffs failed to reassert their wish because they were told that. See Docket No. 141, Plaintiffs' Opposition, Exhibit 42, deposition of George Acosta López, at 33, ll. 13-22; Exhibit 41, deposition of Israel Martínez Aponte, at 60, ll. 8-11.

[64]See Docket 141, Plaintiffs' Opposition, Exhibit 31, Field Memorandum No. 42-94, "H-2A Agricultural Issues Requiring Special Attention," from Barbara Ann Farmer, Administrator for Regional Management, Department of Labor, ETA, April 13, 1994, attached to fax transmission from Daniel L. Lowry, Regional Administrator (GA), to Stan Eury, Pres. NCGA, April 15, 1994.

[65]See id., fax transmission from Daniel L. Lowry, Regional Administrator (GA), to Stan Eury, President NCGA, April 15, 1994.

[66]See id., Exhibit 1, deposition of Stanford Eury, Jr., at 201, ll. 19-23.

CIVIL 97-1589 (JAG)                         37

after the H-2A workers had arrived and been assigned, their rights could be relinquished and subordinated.

As early as April 19, 1994, in a letter to the United States Department of Labor, ETA Regional Administrator Daniel Lowry, Mr. Eury states:

> As I am sure you are aware, the current work period covered by NCGA clearance order already is underway, and the H-2A workers are on site. Therefore, any U.S. workers who <u>apply</u> now—such as the Puerto Ricans scheduled to arrive this week—will be coming in under the 'fifty-percent rule' set forth at § 655.103(e).[67]

Regardless of NCGA's interpretation of the federal regulations, there is no evidence that any Puerto Rican worker arriving on April 19 and April 20, 1994 <u>applied</u> "after the time the foreign workers [had] depart[ed] for the employer's place of employment" such that they would come under the "fifty-percent rule." (Emphasis added.)  Without information as to the date on which each plaintiff applied for the job and without knowing the date on which the H-2A workers departed for each place of employment, the applicability of the "fifty-percent rule" is unascertainable.  Unless the defendants can present credible evidence to support its relevance and application, there is no reason to entertain this issue.  NCGA's position regarding United States workers may very well prove "unreasonable," "unwarranted," and discriminatory, particularly given (1) the statutory and regulatory preference for United States workers, (2) the ultimate reality—whether purposefully or not—that defendants did provide their Mexican H-2A workers with accommodations reflecting their familial and community ties,[68] and (3) the defendants'

---

[67] See id., Exhibit 33, attached correspondence from NCGA's Stan Eury, Jr., President, to United States Department of Labor ETA Regional Administrator Daniel Lowry, letter at 2 (emphasis added). See also Docket No. 115, Defendants' Memorandum for Summary Judgment, deposition of Stanford Eury, Jr., at 204, ll. 1-6 (stating that "These workers were arriving after starting dates, during the 50-percent rule; and, of course, the rules for referral are much different after 50 percent than prior.").

[68] See Docket No. 141, Plaintiffs Opposition, Exhibit 35.

CIVIL 97-1589 (JAG)                    38

obligation to provide United States citizens with "no less than the same benefits, wages, and working conditions which the employer is offering, intends to offer, or will provide to H-2A workers."[69] Defendants' claim is particularly weak given plaintiffs' sworn statements that at least two grower members had not yet received the H-2A workers when the plaintiff workers were distributed among NCGA members.[70]

Plaintiffs have also predicated their disparate treatment claim on the Department of Labor's interpretation of the defendants' obligations under 20 C.F.R. § 655.102(a) and § 655.103(e):

---

[69]See 20 C.F.R. § 655.102(a). In reaching this conclusion, I also consider the alleged controversy regarding plaintiffs' travel accommodations.  According to Puerto Rico Department of Labor's Eileen Ramírez Colón, starting on March 23, 1994, the Puerto Rico Department of Labor staff had a series of disagreements with NCGA's Stan Eury, who refused to cooperate with their efforts to procure the earliest, cheapest, and closest flight. See Docket No. 141, Plaintiffs' Opposition, Exhibit 4, deposition of Eileen Ramírez Colón, at 85-96.  According to Ms. Ramírez Colón, it was solely because the Puerto Rico Department of Labor "was waiting for the arrangements with Mr. Eury" that the Puerto Rican workers were unable to leave for North Carolina sooner than April 19 and 20. Id., at 95, ll. 4-8. In addition, the deposition testimony of Puerto Rico Department of Labor's Mateo Vélez Sánchez stating that "when we got there my guys were sitting down, not making enough money to eat, while [foreigner workers] were working eight hours a day" raises a substantial question as to the possibility of less favorable, disparate treatment of United States citizens regarding their day-to-day work assignments in contravention of 8 U.S.C. §§ 1188(c)(3)(B)(iv) and (v) and 20 C.F.R. § 655.103(e). See Docket No. 141, Plaintiffs' Opposition, Exhibit 5, deposition of Mateo Vélez Sánchez, at 115-117, 119. See also Exhibit 39, deposition of José Luis López Morales, at 65, ll. 1-3, 5, 11 (stating that there were days when United States workers from Puerto Rico would not have any work while the H-2A workers worked on).

[70]See Docket No. 141, Plaintiffs Opposition, Exhibit 39, deposition of José Luis López Morales, at 65, ll. 11-15 (stating that the H-2A workers arrived at defendant Bennett's place of employment after the Puerto Rican workers); Exhibit 59, subdivision b, interrogatories of Carlos G. Pérez (stating that he was among the first workers to arrive to the camp of Hursel Johnson and that there was housing vacancies on the house where he stayed).

1    CIVIL 97-1589 (JAG)                        39

2

3

4        If individual members of an association are able to absorb an entire crew of qualified and available U.S. workers without exceeding stated labor needs, failure on the part of the association to place the workers as a crew would be considered to be in contradiction with regulatory requirements concerning the hiring of U.S. workers. If the crew and its members wish to be placed as a group, and there are sufficient openings with one or more employer members of an association to accommodate group placement, the association would be required to place the entire crew with the appropriate employer. It would not be permissible to allow the association to break up the crew and offer to place the workers among several employers.[71]

9        Unless the defendants can establish that their refusal to so assign United States

10   workers as a crew was based either on the verifiable lack of qualifications of the available

11   United States workers[72] or on the verifiable fact that the association's grower members

12   were unable to comply with this mandate without exceeding their stated labor needs, failure

13   to have done so "would constitute a violation of the labor certification and the job

14   order[.]"[73]

15

16   _____

    [71]See Docket No. 141, Plaintiffs' Opposition, Exhibit 31, Field Memorandum No. 42-94, "H-2A Agricultural Issues Requiring Special Attention," from Barbara Ann Farmer, Administrator for Regional Management, Department of Labor, ETA, April 13, 1994, attached to fax transmission from Daniel L. Lowry, Regional Administrator, (GA), to Stan Eury, President, NCGA, April 15, 1994, ¶ 4(B)(1)(b)(ii), at 2-3.

    [72]See Docket No. 141, Plaintiffs' Opposition, Exhibit 17, NCGA telephone interview of David Orengo (tobacco experience in Connecticut and South Carolina); Alfredo Nazario (was not asked about agricultural experience); Juan González Gauthier (experience in agriculture, not asked about experience in tobacco); Manuel Vélez García (tobacco experience in Connecticut); Rafael Vélez (agricultural experience, not asked about experience in tobacco); Edson Cupeles Rivera (tobacco experience in Connecticut).

    [73]See id., Exhibit 31. Though defendants attempt to predicate their entitlement to summary judgment as to this issue on Title VII procedural safeguards, plaintiffs' alleged failure to exhaust these administrative remedies is immaterial to their claims. Plaintiffs have at not raised the possibility of seeking Title VII remedies. Moreover, following the Department of Labor's determination that defendants' reluctance to conform to the regulations would constitute a violation of the job offer, this court may continue to construe plaintiffs' complaints as grounded and governed by the principles of breach of contract.

1  CIVIL 97-1589 (JAG)                    40

2

3

4       In view of the above, I recommend that the motion for summary judgment as to the

   issue of disparate treatment be DENIED.
5

6       D) Individual Claims

7       (i) Pesticide Exposure

        Plaintiffs Roberto Christian, Heriberto Cruz Vega, Juan García Carrero, Wilfredo
8
   González, José González Gauthier, Manuel Vega García, Edson Cupeles Rivera, and Luis
9
   Hernández Meléndez claim that they were exposed to pesticides during their employment
10
   with the defendants, in violation of their working arrangement.[74]  Plaintiffs argue that they
11
   are entitled to damages for emotional distress resulting from the defendants' alleged
12
   violation of 40 C.F.R. § 170.112(a)(1)[75] of the Worker Protection Standard, under the
13
   Environmental Protection Act, 7 U.S.C. § 136w.  See Soto v. Jurado, 166 F.3d 1222 (10th
14
   Cir. 1998), (affirming lower court's award for emotional distress as part of compensatory
15
   damages); Martínez v. Shinn, 992 F.2d 997, 1001 (9th Cir. 1993) (affirming lower court's
16
   emotional distress award under AWPA for retaliatory termination of employment).
17

18

19   ────────────────────

         [74]See id., Exhibit 84, deposition of Juan García Carrero, at 48; ll. 11-25; at 49
20   (discussing pesticide exposure while working for defendant Upchurch); deposition of
21   Manuel Vega García, at 29, ll. 22-25; at 65, ll. 21-25; at 66; at 67, ll. 1-17 (same, while
     working for defendant Butter); deposition of Heriberto Cruz Vega, at 102, ll. 23-24; at
22   103-108; deposition of José González Gauthier, at 54 (same, while working for defendant
23   Aycock); deposition of Roberto Christian, at 118, ll. 18-24; at 119; at 120, ll. 1-18 (same,
     while working for defendant Rosser); Exhibit 85, First Set of Interrogatories, Luis
24   Hernández Meléndez, at 4 (answer to question 3) (pesticide exposure while working for
25   defendant Ross); Edson Cupeles Rivera, at 8 (answer to question 18) (same, while working
     for defendant Dalrymple).
26       [75]Title 40 C.F.R. § 170.112(a)(1) states that "[a]fter the application of any pesticide
27   on an agricultural establishment, the agricultural employer shall not allow or direct any
     worker to enter or to remain in the treated area before the restricted-entry interval specified
28   on the pesticide labeling has expired, except as provided in this section.

1   CIVIL 97-1589 (JAG)                          41

2

3

4          Defendants, however, deny both that any workers were improperly exposed to

pesticide poisoning and that any worker would be entitled to relief for such exposure.
5
Defendants contend that the exclusive remedy available to the workers would have been
6
the filing of a workers' compensation claim. They argue that their position is supported
7
by the exclusivity provision of 29 U.S.C. 1854(d)(1).[76] See Deck v. Peter Romein's Sons,
8
Inc., 109 F.3d 383, 389 (7th Cir. 1997). However, their argument ignores that plaintiffs'
9
claims for emotional distress are distinguishable from claims for physical injuries under the
10
pertinent workers' compensation statute. Such claims are neither "provided for" or
11
otherwise compensable under North Carolina's Workers' Compensation Act,[77] nor barred
12
by its provisions. See 29 U.S.C. 1854(d)(1); Hogan v. Forsyth Country Club Co., 340 S.E.
13
2d 116, 120-121 (N.C. App. 1986). It disregards that the exclusive remedy prescribed by
14
section 1854(d)(1) does not preclude recovery for statutory damages or equitable relief so
15
long as these do not affect recovery under the state workers' compensation law or the rights
16

17

18

19

20
    _____
21      [76]Title 29 U.S.C. 1854(d)(1) reads
        Notwithstanding any other provision of this chapter, where a State workers'
22      compensation law is applicable and coverage is provided for a migrant or
        seasonal agricultural worker, the workers' compensation benefits shall be the
23      exclusive remedy for loss of such worker under this chapter in the case of
        bodily injury or death in accordance with such State's workers' compensation
24      law.
25      [77]Regardless of whether or not this document was ever received by plaintiffs,
26  according to defendants' Attachment to ETA 790, at 12, workers would be covered "by the
    North Carolina Worker's (sic) Compensation Insurance or equivalent employer provided
27  insurance for injuries arising out of and in the course of employment." Docket No. 115,
28  Defendants' Memorandum for Summary Judgment, Exhibit 1.

CIVIL 97-1589 (JAG)                    42

under such.[78]    Defendants ignore the fact that plaintiffs are attempting to recover for violations of the terms of their working arrangements under 29 U.S.C. § 1822(c).

Plaintiffs' claims for an award of damages for emotional distress are therefore supported by AWPA. I therefore recommend that the motion for summary judgment in relation to this issue be DENIED.

(ii) Housing

Section 1823(a) stipulates that

each person who owns or controls a facility or real property which is used as housing for migrant agricultural workers shall be responsible for ensuring that the facility or real property complies with substantive Federal and State safety and health standards applicable to that housing.

In addition, subparagraph (b)(1) states that certification does not relieve any such person of their responsibilities under subsection (a). See 29 U.S.C. §§ 1823(a) and (b)(1).

Plaintiffs allege that the defendants failed to provide them with housing facilities and to maintain them in compliance with the substantial standards expected under AWPA. In particular, plaintiffs have introduced evidence accusing the defendants of, *inter alia*, providing unsanitary mattresses in violation of 29 C.F.R. § 1910.142(b)(3) and/or the North Carolina Migrant Housing Act, N.C. Gen. Stat. § 95-129[79]; failing to provide hot

_____

[78]See 29 U.S.C. § 1854(d)(2), stating that
The exclusive remedy prescribed by paragraph (1) precludes the recovery under subsection (c) of this section of actual damages for loss from an injury or death but does not preclude recovery under subsection (c) of this section for statutory damages or equitable relief, except that such relief shall not include back or front pay or in any manner, directly or indirectly, expand or otherwise alter or affect (A) a recovery under a State workers' compensation law or (B) rights conferred under a State workers' compensation law.

[79]N.C. Gen. Stat. § 95-129(2) reads "Each employer shall comply with occupational safety and health standards or regulations promulgated pursuant to this article." See also N.C. Gen. Stat. § 95-225(a), which stipulates that, "Unless otherwise provided, all established federal standards are adopted and shall be enforced by the Department of Labor

1    CIVIL 97-1589 (JAG)                    43

2

3

4    ————————————————

5    of North Carolina." See, e.g., Docket No. 141, Plaintiffs' Opposition, Exhibit 59, First Set of Interrogatories, Baltazar Ortiz Correa, (answer to question 21) (while working for defendant Chester Pilson); First Set of Interrogatories, Carlos Pérez Adames, (answer to

6    question 21) (while working for defendant Hursel Johnson); First Set of Interrogatories,

7    Héctor Pérez Soto, (answer to question 21) (while working for Hursel Johnson); First Set

8    of Interrogatories, Gabriel Ramos Rojas, (answer to question 21)(while working for Hursel Johnson); deposition of Gabriel Ramos Rojas, at 64, ll. 6-12 (while working for Hursel

9    Johnson); First Set of Interrogatories, Radamés Pacheco, (answer to question 21) (while

10   working for Nelson Phillips); First Set of Interrogatories, Darío Llantín Lugo, (answer to question 21) (while working for Nelson Phillips); deposition of Darío Llantín Lugo, at 66,

11   ll. 22-23 (while working for Nelson Phillips); First Set of Interrogatories, Domingo Colón

12   Ayala, (answer to question 21) (while working for Bobby Ham); First Set of Interrogatories, Juan Vélez Serrano, (answer to question 21) (while working for Bobby Ham); First Set of

13   Interrogatories, Jesús Barreto Bermúdez, (answer to question 21) (while working for Bobby

14   Ham); First Set of Interrogatories, Pedro Sánchez Díaz, (answer to question 21) (while working for Bobby Ham); deposition of Saturnino Medina Avilés, (while working for Bobby

15   Ham); First Set of Interrogatories, Edwin Echevarría, (answer to question 21) (while

16   working for Dennis Smith); First Set of Interrogatories, Richard Rivera Flores, (answer to question 21) (while working for Dennis Smith); First Set of Interrogatories, Edwin Febus

17   Rivera, (answer to questions 20-21) (while working for Jimmy Ross); First Set of

18   Interrogatories, Luis Hernández Meléndez, (answer to questions 20-21) (while working for Jimmy Ross); First Set of Interrogatories, Louis González Gauthier, (answer to question 21)

19   (while working for Phil Aycock); deposition of Louis González Gauthier, at 26, ll. 10-17;

20   First Set of Interrogatories, Juan González Gauthier, (answer to question 21) (while working for Phil Aycock); deposition of Juan (José) González Gauthier, at 45, ll. 1-3; at 68,

21   ll. 15-16; First Set of Interrogatories, Luis Angel Alvarez Rosa, (answer to question 21)

22   (while working for Ricky Carter); deposition of Luis Angel Alvarez Rosa, at 79, ll. 8-12; deposition of Heriberto Alvarez Rosa, at 38, ll. 16-25; at 39, ll. 1-10 (while working for

23   Ricky Carter); First Set of Interrogatories, Israel Martínez Aponte, (answer to question 20)

24   (while working for Jarvis McDonald); First Set of Interrogatories, Ricardo Matos Caraballo, (answer to questions 20-21) (while working for Larry Eason); First Set of Interrogatories,

25   Jesús Rivas Rosado, (answer to question 21) (while working for Cabell Early); First Set of

26   Interrogatories, Israel Rivera Morales, (answer to question 20) (while working for Miles Jackson); First Set of Interrogatories, Nelson Sanabria Flores, (answer to question 20)

27   (while working for Jeffrey Upchurch); First Set of Interrogatories, Juan García Carrero, (answer to question 20) (while working for Jeffrey Upchurch); First Set of Interrogatories,

28   Efraín Alvarez Rosa, (answer to question 21) (while working for Daniel Nelson); deposition

CIVIL 97-1589 (JAG)                    44

water for cooking or bathing in violation of 29 C.F.R. § 1910.142(f)(3) and/or the N.C.

Gen. Stat. § 95-225(g)(2) (1997)[80]; failing to provide laundry facilities in violation of 29

C.F.R. § 1910.142(f)(1)[81]; failing to provide heat in violation of 20 C.F.R. § 654.409(a)

---

of Efraín Alvarez Rosa, at 25, ll. 8-22; First Set of Interrogatories, Roberto Christian
Rodríguez, (answer to question 21) (while working for Randy Rosser); deposition of
Roberto Christian Rodríguez, at 66, ll. 12-16; at 67, ll. 14-24; at 68-71; at 72, ll. 1-13.

[80]Title 29 C.F.R. § 1910.142(f)(3) reads: "An adequate supply of hot and cold
running water shall be provided for bathing and laundry purposes. Facilities for heating
water shall be provided." N.C. Gen. Stat. § 95-225(g)(2) (1997) reads, in its pertinent
part: "A kitchen facility shall be provided with ... a sink with running hot and cold water."
For the relevant complaints, see, e.g., Docket No. 141, Plaintiffs' Opposition, Exhibit 59,
First Set of Interrogatories, Baltazar Ortiz Correa, at 9 (answer to question 21); First Set
of Interrogatories, Edwin Echevarría, (answer to question 21); First Set of Interrogatories,
Richard Rivera Flores, (answer to question 21); First Set of Interrogatories, Luis Angel
Alvarez Rosa, (answer to question 21); deposition of Heriberto Alvarez Rosa, at 38, ll. 19-
20; First Set of Interrogatories, Efraín Alvarez Rosa, (answer to question 21).

[81]Title 29 C.F.R. § 1910.142(f)(1) reads, in its relevant part:
Laundry, handwashing, and bathing facilities shall be provided in the
following ratio:
(i)  Handwash basin per family shelter or per six persons in shared facilities.
(ii) Shower head for every 10 persons.
(iii) Laundry tray or tub for every 30 persons.
(iv) Slop sink in each building used for laundry, handwashing, and bathing.
See also N.C. Gen. Stat. § 95-225(a), which stipulates that, "Unless otherwise provided,
all established federal standards are adopted and shall be enforced by the Department of
Labor of North Carolina." For the relevant complaints, see, e.g., Docket 141, Plaintiffs'
Opposition, Exhibit 59, First Set of Interrogatories, Baltazar Ortíz Correa, at 9 (answer to
question 21); First Set of Interrogatories, Domingo Colón Ayala, (answer to question 21);
First Set of Interrogatories, Juan Vélez Serrano, (answer to question 21); First Set of
Interrogatories, Jesús Barreto Bermúdez, (answer to question 21); First Set of
Interrogatories, Pedro Sánchez Díaz, (answer to question 21); deposition of Saturnino
Medina Avilés; First Set of Interrogatories, Abraham Garayúa Candelario, (answer to
question 21); First Set of Interrogatories, Jesús Rivas Rosado, (answer to question 21)
(while working for Cabell Early).

1  CIVIL 97-1589 (JAG)                    45

2

3

4  and/or 29 C.F.R. § 1910.142(b)(11) and/or N.C. Gen. Stat. § 95-225(e) (1997)[82]; failing

5  to provide sufficient beds for all workers in violation of 20 C.F.R. § 655.102(b)(1) and 29

6

7

8

9  _____

10  [82]Title 20 C.F.R. § 654.409(a) requires that
    All living quarters and service rooms shall be provided with properly installed,
11  operable heating equipment capable of maintaining a temperature of at least
    68 <<degrees>> F. if during the period of normal occupancy the
12  temperature in such quarters falls below 68 <<degrees>>.

13  Title 29 C.F.R. § 1910.142(b)(11) reads
    All heating, cooking, and water heating equipment shall be installed in
14  accordance with State and local ordinances, codes, and regulations governing
    such installations. If a camp is used during cold weather, adequate heating
15  shall be provided.

16  N.C. Gen. Stat. § 95-225(e) reads
    Whenever the outside temperature falls below 50 degrees Fahrenheit and the
17  migrant housing is occupied, heating equipment shall be provided and
    operable. Regardless of outside temperature, this equipment must be capable
18  of maintaining living areas of 65 degrees Fahrenheit. If housing is to be
    occupied from May 15 until September 1 only, no heating equipment shall
19  be required at the time of preoccupancy inspection.

20  
21  See, e.g., Docket No. 141, Plaintiffs' Opposition, Exhibit 59, First Set of Interrogatories,
    Carlos Pérez Adames, at 9, 10 (answer to question 21); First Set of Interrogatories, Héctor
22  Pérez Soto, (answer to question 21); First Set of Interrogatories, Radamés Pacheco,(answer
    to question 21); First Set of Interrogatories, Edwin Febus Rivera, (answer to questions 20-
23  21); First Set of Interrogatories, Luis Hernández Meléndez, (answer to questions 20-21);
24  First Set of Interrogatories, Louis González Gauthier, (answer to question 21); deposition
    of Louis González Gauthier, at 25, ll. 12-13; First Set of Interrogatories, Juan González
25  Gauthier, (answer to question 21); deposition of Juan González, at 67, ll. 14-21; First Set
26  of Interrogatories, Jesús Rivas Rosado , (answer to question 21); First Set of Interrogatories,
    Nelson Sanabria Flores, (answer to question 20); First Set of Interrogatories, Juan García
27  Carrero, (answer to question 20); First Set of Interrogatories, Roberto Christian Rodríguez,
28  (answer to question 21).

1  CIVIL 97-1589 (JAG)                    46

2

3

4  C.F.R. § 1910.142(b)(3)[83]; of providing housing with leaking roofs in violation of 29 C.F.R.

5  § 1910.142(b)[84]; of providing housing infested with pests in violation of 29 C.F.R. §

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20  _____

21  [83]In particular, 20 C.F.R. § 655.102(b)(1) stipulates, in its relevant part, that: "The
    employer shall provide to those workers who are not reasonably able to return to their
    residence within the same day housing, without charge to the worker[.]"

22  See, e.g., Plaintiffs' Opposition, Exhibit 59, First Set of Interrogatories, Radamés Pacheco,
23  (answer to question 21).

24  [84]29 C.F.R. § 1910.142(b) reads: "Every shelter in the camp shall be constructed in
    a manner which will provide protection against the elements." See, e.g., Plaintiffs'
25  Opposition, Exhibit 59, First Set of Interrogatories, Carlos Pérez Adamés (answer to
    question 21); First Set of Interrogatories, Héctor Pérez Soto (answer to question 21);
26  Deposition of Gabriel Ramos Rojas, p. 66, ll. 20-24; 67, ll. 1-15; First Set of
27  Interrogatories, Jesús Rivas Rosado (answer to question 21); Nelson Sanabria Flores
    (answer to question 20); First Set of Interrogatories, Juan García Carrero (answer to
28  question 20).

1  CIVIL 97-1589 (JAG)                    47

2

3

1910.142(j) and/or N.C. Gen. Stat. 95-225(g) (1997)[85]; of providing toilets that did not

4  work properly or of not providing sufficient functioning toilets in violation of 29 C.F.R. §§

5

6

7

8

9

10

11

12

13

14

─────────────────

15    [85]Title 29 C.F.R. § 1910.142(j) stipulates that "Effective measures shall be taken to prevent infestation by and harborage of animal or insect vectors or pests." In its pertinent

16  parts, N.C. Gen. Stat. 95-225(g) reads

17         (1) Food preparation facilities and eating areas shall be provided and maintained in a clean and sanitary manner;

18         ...

19         (4) Acceptable storage facilities shall be provided and shall be kept clean and free of vermin[.]

20  See Docket No. 141, Plaintiffs' Opposition, Exhibit 59, First Set of Interrogatories, Carlos

21  Pérez Adames, at 9, 10 (answer to question 21); First Set of Interrogatories, Héctor Pérez Soto, (answer to question 21); First Set of Interrogatories, Abraham Garayúa Candelario,

22  (answer to questions 20-21); First Set of Interrogatories, Israel Martínez Aponte, (answer

23  to question 20); First Set of Interrogatories, Alfredo Nazario, (answer to question 20); First Set of Interrogatories, Jesús Rivas Rosado, (answer to question 21); First Set of

24  Interrogatories, Israel Rivera Morales, (answer to question 20); First Set of Interrogatories,

25  Nelson Sanabria Flores, (answer to question 20); First Set of Interrogatories, Juan García Carrero, (answer to question 20); First Set of Interrogatories, José Luis Vásquez, (answer

26  to question 20) (while working for Terry Neal); First Set of Interrogatories, Efraín Alvarez

27  Rosa, (answer to question 21); First Set of Interrogatories, Roberto Christian Rodríguez, (answer to question 21); deposition of Roberto Christian Rodríguez, at 76, ll. 14-24; at 77,

28  ll. 1-7.

CIVIL 97-1589 (JAG)                            48

1910.142(d) and/or (d)(5) and/or (d)(10)[86]; and of providing housing with holes in the walls in violation of 29 C.F.R. § 1910.142(b)(1).[87]

Nevertheless, defendants contend that they are entitled to summary judgment with respect to the housing violations alleged by plaintiffs. They base this argument on the fact that "prior to plaintiffs' occupancy of their housing in 1994, defendants had their housing

---

[86]Title 29 C.F.R. § 1910.142(d), in its applicable subsections, reads
(1) Toilet facilities adequate for the capacity of the camp shall be provided.
...
(5) Where toilet facilities are shared, the number of water closets or privy seats provided for each sex shall be based on the maximum number of persons of that sex which the camp is designed to house at any one time, in the ration of one such unit to each 15 persons, with a minimum of two units for any shared facility.
...
(10) Privy and toilet rooms shall be kept in sanitary conditions. They shall be cleaned daily.
See, e.g., Docket No. 141, Plaintiffs' Opposition, Exhibit 59, First Set of Interrogatories, Carlos Pérez Adames, at 10 (answer to question 21); First Set of Interrogatories, Héctor Pérez, (answer to question 21); First Set of Interrogatories, Domingo Colón, (answer to question 21); First Set of Interrogatories, Juan Vélez, (answer to question 21); First Set of Interrogatories, Jesús Barreto, (answer to question 21); First Set of Interrogatories, Pedro Sánchez, (answer to question 21); First Set of Interrogatories, Edwin Febus, (answer to questions 20-21); First Set of Interrogatories, Luis Hernández Meléndez, (answer to questions 20-21); First Set of Interrogatories, José Luis Vásquez, (answer to question 20).
[87]Title 29 C.F.R. § 1910.142(b)(1) requires "Every shelter in the camp shall be constructed in a manner which will provide protection against the elements." See, e.g., Docket No. 141, Plaintiffs' Opposition, Exhibit 59, First Set of Interrogatories, Carlos Pérez Adames, at 9, 10 (answer to question 21); First Set of Interrogatories, Héctor Pérez, (answer to question 21); First Set of Interrogatories, Edwin Echevarría, (answer to question 21) (while working for Dennis Smith); First Set of Interrogatories, Richard Rivera, (answer to question 21); First Set of Interrogatories, Israel Martínez, (answer to question 20); First Set of Interrogatories, Alfredo Nazario, (answer to question 20); First Set of Interrogatories, Israel Rivera, (answer to question 20); First Set of Interrogatories, José Luis Vásquez, (answer to question 20); First Set of Interrogatories, Efraín Alvarez, (answer to question 20); deposition of Efraín Alvarez, at 25-29, 70.

CIVIL 97-1589 (JAG)                    49

inspected and certified to ensure that it met the federal standards as set forth in 20 C.F.R. § 655.102(b)(1)(i)."[88] In light of the clear statutory language, it is evident that AWPA requires not just pre-occupancy, but continuing compliance throughout occupancy. See Howard v. Malcolm, 658 F. Supp. at 432 (inspection certification does not per se establish the lack of section 1823(a) violations, nor does it stand for the proposition that, even on the date of inspection, the labor camp met all the federal safety and health standards); see also Sánchez v. Overmyer, 891 F. Supp. 1253, 1258 (N.D. Ohio 1995). Defendants' argument, therefore, lacks merit.

Defendants look for support in Alvarez v. Joan of Arc, Inc. for the proposition that they were entitled to rely on the state's "inspection, approval, and certification process to show that, prior to occupancy, the housing was up to the required standards."[89] Unlike in the case at hand, however, in Alvarez v. Joan of Arc, Inc., there was no evidence presented at trial to suggest that the housing was not in compliance with established standards when the workers' tenancy began. See Alvarez v. Joan of Arc, Inc., 658 F.2d at 1222. In addition, the facilities there in question were subjected to follow-up inspections, "from time to time," by employees of the state Department of Public Health and the United States Department of Labor. Id.

Defendants alternatively contend that they should not be held liable for any housing violations they may have incurred since these were "de minimis," rather than substantive and since none but one of the defendants was cited for housing violations either by the United

---

[88]See Docket No. 115, Defendants' Memorandum for Summary Judgment, at 44. Title 20 C.F.R. § 655.102(b)(1)(i) requires that
> Housing provided by the employer shall meet the full set of DOL Occupancy Safety and Health Administration standards set forth at 29 C.F.R. § 1910.142, or the full set of standards at §§ 654.404-654.417 of this chapter[.]

[89]See Docket No. 115, Defendants' Memorandum for Summary Judgment, at 45.

CIVIL 97-1589 (JAG)                    50

States or the North Carolina Department of Labor. This assertion clearly disregards that, according to 29 C.F.R. § 500.133, "substantive health and safety standards" include, *inter alia*, an adequate and sanitary supply of water, structurally sound construction of buildings, effective maintenance of those buildings, provision of adequate heat as weather conditions require, and reasonable protections for inhabitants from insects and rodents.

Moreover, their argument concerning the failure of the pertinent Departments of Labor to cite them for these alleged violations is irrelevant, since there is no evidence that any post-occupancy inspections took place and since the violations at issue relate to the defendants' failure to comply with AWPA's 29 U.S.C. § 1823(a) and (b)(1) and its regulations, not to the Departments' failure to enforce these.

In view of the above, I recommend that the motion for summary judgment as to defendants' alleged housing violations be DENIED.

(iii) Record Keeping Violations

Section 1821(d) imposes on agricultural employers and associations who employ migrant workers a reasonable standard of quality business and record keeping practices which requires them to,

> (1) with respect to each such worker, make, keep, and preserve records for three years of the following information
> (A) the basis on which wages are paid;
> (B) the number of piecework units earned, if paid on a piecework basis;
> (C) the number of hours worked;
> (D) the total pay period earnings;
> (E) the specific sums withheld and the purpose of each sum withheld; and
> (F) the net pay; and
> (2) provide to each such worker for each pay period, an itemized written statement of the information required by paragraph (1) of this subsection.

See 29 U.S.C. § 1821(d); see also 29 C.F.R. § 500.80(d).

Plaintiffs allege that the defendants variously failed to comply with their obligations under AWPA's record keeping stipulations by, *inter alia*, misrepresenting in their payroll

CIVIL 97-1589 (JAG)                             51

records and wage statements the hours worked by and owed to plaintiffs in violation of 29 U.S.C. § 1821(d)(1)(c)[90]; by making unspecified deductions in violation of 29 U.S.C. § 1821(d)(1)(e)[91]; by failing to disclose the piece rate for certain crops in violation of 29 U.S.C. § 1821(d)(1)(a)[92]; and by failing to provide an itemized written pay statement in violation of 29 U.S.C. § 1821(d)(2).[93] See also Washington v. Miller, 721 F.2d at 801-02; Rivera v. Adams Packing Ass'n, Inc., 707 F.2d at 1281-82 (holding that an agricultural employer fails to comply with the record keeping requirements were he maintains records that do not contain the required information or that contain erroneous information— e.g., records that omit or underreport the real total number of hours worked or that fail to report deductions); Escobar v. Baker, 814 F. Supp. at 1506 (stating that one of the purposes of AWPA is to prevent the exploitation of migrant workers by agricultural employers who make deductions from the workers' pay but refuse to account for these).

---

[90]See Docket No. 115, Defendants' Memorandum for Summary Judgment, Exhibit 53, First Set of Interrogatories, José Enrique Lugo, (answer to question 22) (while working for defendant Phillips); Exhibit 54, First Set of Interrogatories, Darío Llantín, (answer to question 23) (while working for defendant Phillips); Exhibit 55, First Set of Interrogatories, Radamés Pacheco, (answer to question 22) (while working for defendant Newsome Brothers); see also Docket No. 141, Plaintiffs' Opposition, Exhibit 66, deposition of José Enrique Lugo, at 76, ll. 23-25; at 77-79; Exhibit 67, First Set of Interrogatories, George Acosta López, (answers to questions 18, 20, 21).

[91]See id., Exhibit 46, Payroll records for the pay date of May 29, 1994, for plaintiff José Raúl Ríos Cruz, while working for defendant Dixon; Exhibit 47, Payroll records for the pay period of June 20, 1994 to June 25, 1994, for plaintiff George Acosta, while working for defendant Newsome.

[92]See id., Exhibit 46, statement for the pay period comprising June 24, 1994 up to June 30, 1994, for plaintiff José Raúl Ríos Cruz, while working for defendant Dixon.

[93]See id., Exhibit 51; see also Docket No. 141, Plaintiffs' Opposition, Exhibit 63 (both concerning plaintiff José Ponce's work for defendant William D. Lee). As to plaintiff Heriberto Cruz's claims against defendant Ernest Evans, see id., Exhibit 65. Plaintiffs additionally allege that defendants failed to deduct Social Security taxes.

CIVIL 97-1589 (JAG)                    52

Since the defendants—oftentimes without producing any evidence supporting their contentions—simply deny having incurred in any such alleged violations, clearly there exist genuine issues of fact and questions of credibility that need to be resolved at trial. Defendants Dixon, Phillips, Lee, and Evans, for instance, maintain that since there is evidence of record that they may have sometimes complied with their record keeping obligations, the court should simply take their word that they always did. Yet, because the pertinent records should be under their custody and in their possession, there is no reason why their failure to produce this evidence could not be construed as an admission of their failure to comply. Moreover, while at least one defendant—namely, Newsome Brothers— bases his defense on a United States Department of Labor report (conducted between April 11, 1994 and July 31, 1994) whose specific subject matter and findings have not been otherwise introduced into the record, a grower's reliance on Department of Labor approval "[does] not constitute an across-the-board defense to any and all [AWPA] claims." See H.R. Rep. No. 97-885, at 17-18 (as to Congress' intention "that this section be interpreted with the broadest possible meaning to ensure that the person who owns or controls the facility used as housing ... is responsible for maintaining that facility in compliance with all substantive federal and state safety and health standards"); Donaldson v. United States Dep't of Labor, 930 F.2d at 349 (reliance on Department of Labor approval did not protect growers from liability or preclude recovery by workers); Sánchez v. Overmyer, 845 F. Supp. 1183, 1191 (N.D. Ohio 1993) (finding that representative of the state Department of Health was not authorized to create an exception to AWPA's safety and health standards).

(iv) Failure to Pay Wages When Due[94]

---

[94]Plaintiff José Raúl Ríos Cruz also claims that defendant Dixon failed to pay him the guaranteed $5.38/hour rate. See Docket No. 141, Plaintiffs' Opposition, Exhibit 61 and 62; see also Docket No. 115, Defendants' Memorandum for Summary Judgment, Exhibit 46, statement for the pay period comprising June 17, 1994 up to June 23, 1994, for

1    CIVIL 97-1589 (JAG)                        53

2

3

4    Under AWPA and the relevant federal regulations, defendants were bound to pay

5    the wages owed any migrant worker when due.  29 U.S.C. § 1822(a); 29 C.F.R. § 500.81.

6    Although the regulations only require that agricultural employer and agricultural

7    association pay the worker no less often than every two weeks (or semi-monthly),

8    defendants had agreed, as part of their agricultural working arrangement, to pay workers

9    weekly.[95]

10       Among plaintiffs' complaints are the defendants' alleged failure to pay when due; to

11   pay the stipulated and owed piece rate; to pay for travel time from field to field and for

12   otherwise compensable time; and to honor the first week guarantee as stipulated in the

13   Puerto Rico Department of Labor summaries of the Agricultural Work Agreement.[96]  In

14   response to the allegations that they did not pay when due, the defendants have produced

15   documentation purporting to be the payroll records for plaintiffs José Ríos Cruz, George

16   Acosta, and Radamés Pacheco.

17       None of the payroll statements provided for plaintiff José Ríos Cruz, however, bears

18   his signature, as seems to otherwise be the practice among agricultural employers.[97]  The

19   court thus has no way to ascertain their authenticity or the accuracy of the statements

20   _____

plaintiff José Raúl Ríos Cruz, while working for defendant Dixon.

21   [95]See Docket No. 115, Defendants' Memorandum for Summary Judgment, Exhibit 1, Job Order Attachment; Exhibit 12.

22   [96]See, e.g., id., Exhibit 52, First Set of Interrogatories, Efraín Flores, (answer to

23   question 21); Exhibit 53, First Set of Interrogatories, José Enrique Lugo Torres, (answer to question 23); Exhibit 54, First Set of Interrogatories, Darío Llantín Lugo, (answer to

24   question 22); Exhibit 55, First Set of Interrogatories, Radamés Pacheco, (answer to

25   question 22); Exhibit 56, First Set of Interrogatories, Edison Camacho Caraballo, (answers to questions 20-21).  See also Docket No. 141, Plaintiffs' Opposition, Exhibit 66,

26   deposition of José Enrique Lugo, at 76, ll. 23-25; at 77-79; Exhibit 67, First Set of

27   Interrogatories, George Acosta López, (answer to question 14).

[97]See Docket No. 115, Defendants' Memorandum for Summary Judgment, Exhibit

28   47-48.

CIVIL 97-1589 (JAG)                           54

therein.  Similarly, there are issues considering certain payroll statements for plaintiff George Acosta.  In particular, the signature for plaintiff Acosta's First Set of Interrogatories does not bear a resemblance to that found on the payroll statement for the page stamped "NEW 020," for the pay date of May 30, 1994 (stamped "NEW 001"), for the pay date of June 20, 1994 (stamped "NEW 007"), for the pay date of June 27, 1994 (stamped "NEW 009"), for the pay date of July 5, 1994 (stamped "NEW 011"), for the pay date of July 11, 1994 (stamped "NEW 013"), or for the pay date of July 18, 1994 (stamped "NEW 015").[98]  Payroll statements for Radamés Pacheco have similar problems, in that some bear no signature, while others bear signatures of questionable genuineness.[99]

Defendants also allege that plaintiffs claims should not be tried given the small monetary difference between what plaintiffs were legally entitled to and what they actually received.  Regardless of the amount, however, failure to pay the amount when due violates AWPA and its concomitant regulations.

As to the defendants' contention that the "first week guarantee" should not apply to plaintiffs, since they failed to contact the job services office prior to the contractually specified date.  Specifically, this guarantee—as codified at 20 C.F.R. § 653.501(d)(2)(v)(D)—states that

> If the employer fails to notify the order-holding office at least 10 days prior to the original date of need the employer shall pay eligible ...workers referred through the clearance system the specified hourly rate of pay, or in the absence of a specified hourly rate of pay, the higher of the Federal or State minimum wage for the first week starting with the originally anticipated date of need.

---

[98] See Docket No. 115, Defendants' Memorandum for Summary Judgment, Exhibit 47.

[99] See id., Exhibit 47.

CIVIL 97-1589 (JAG)                    55

As disclosed in the summaries of job order NC 7930794, however, the defendants simply guaranteed workers the "Salary for the first week of employment."[100] Moreover, the Spanish version plainly states that the first week of "your" (in Spanish, "su") employment is guaranteed.  Thus, irrespective of the language of the statute, it appears that the defendants may have actually contracted to guarantee the first week of each worker's employment, without regard to the first date of agricultural need.  In addition, the document is unclear on its face as to whether to the nature of the required contact between the potential worker and the "Sanford Esc."  One could reasonably construe this clause to mean that the worker must express his interest in the employment offer prior to April 4, 1994.  Further, there are questions as to whether this practice would be permitted under AWPA and as to whether plaintiffs received this disclosure prior to such date.

Because summary judgment motions are not appropriately rendered based on credibility assessments and because of the existence of genuine issues of material fact, I recommend that the motion for summary judgment as to payment of wages when due be DENIED.

(v) Transportation, Field Sanitation, and Working Arrangement Violations, i.e. Provision of Cooking Utensils, Blankets, Sheets, and Pillows, Transportation to the Store

Federal regulation 29 C.F.R. § 500.102 requires that any vehicle used by any farm labor contractor, agricultural employer or agricultural association to transport migrant agricultural workers shall meet the vehicle safety standards prescribed in section 500.104 or section 500.105 (if a vehicle other than a passenger automobile or station wagon).  29 C.F.R. § 500.102.

Plaintiffs have claimed that the defendants transported them in trucks without seats or guardrails and in open pickup trucks in violation of 29 U.S.C. § 1841(b)(1)(A) and 29

---

[100] See Docket No. 115, Defendants' Memorandum for Summary Judgment, Exhibit 11.

1  CIVIL 97-1589 (JAG)                    56

2

3

4  C.F.R. § 500.102 and § 500.104(l)[101] and/or § 500.105(b)(3)(vi)(D)[102] and/or §

5  500.105(b)(3)(vii)(E).[103]  The evidence of the record as to the issue of these details of

6  transportation, however, consists merely of sworn testimonies by plaintiffs and defendants

7  which clearly raise genuine issues, and is thus not appropriate for summary disposition.

8  Summary judgment as to this issue should be DENIED.  This is my recommendation.

9      As to field sanitation, federal regulation 29 C.F.R. § 1928.110 includes various

10  requirements—i.e., potable drinking water and toilet and hand washing facilities—imposed

11  on agricultural establishments where at least eleven workers are employed.  29 C.F.R. §

12  1928.110.  Under similar North Carolina regulations, however,

13      [t]he provisions for the Occupational and Health Standards for Agriculture,
       Title 29 of the Code of Federal Regulations ... are incorporated by reference

14

15  ——————————————

16  [101]Regulation 29 C.F.R. § 500.104(l) establishes that

17  [a] seat securely fastened to the vehicle will be provided for each occupant or
    rider in, or on, any vehicle, except that transportation which is primarily on
    private farm roads will be excused from this requirement provided the total
    distance does not exceed ten (10) miles, and so long as the trip begins and
    ends on a farm owned or operated by the same employer.

18  [102]Regulation 29 C.F.R. § 500.105(b)(3)(vi)(D) stipulates that,

19  [a] seat shall be provided for each worker transported.  The seats shall be:

20  Securely attached to the vehicle during the course of transportation; not less
    than 16 inches nor more than 19 inches above the floor; at least 13 inches
    deep; equipped with backrests extending to a height of at least 36 inches

21  above the floor, with at least 24 inches of space between the backrests or
    between the edges of the opposite seats when face to face; designed to provide

22  at least 18 inches of seat for each passenger; without cracks more than two
    inches wide, and the exposed surfaces, if made of wood, planed or sanded

23  smooth and free of splinters.

24  [103]Regulation 29 C.F.R. § 500.105(b)(3)(vii)(E) requires that,

25  [n]o motor vehicle shall be driven if the total number of passengers exceeds
    the seating capacity which will be permitted on seats prescribed in §

26  500.105(b)(3)(vi).  All passengers carried on such vehicle shall remain seated

27  while the motor vehicle is in motion.

28

1  CIVIL 97-1589 (JAG)                    57

2

3
         except ... [that under 29 C.F.R. § 1928.110] the scope shall not be limited
4        to any specific number of employees.

5  13 N.C.A.C. 07F.0301(2). Therefore, as a matter of law, although some defendants claim

6  an exemption from these provisions, all were required to provide field sanitation to all

7  plaintiffs.  Likewise, all defendants were contractually obligated to furnish plaintiffs with

8  cooking utensils, blankets, sheets, and pillows and to provide them transportation to the

9  store. Yet, since the evidence concerning whether or not the defendants actually provided

10 the plaintiff workers with any of these consists primarily of sworn testimonies by both

11 plaintiffs and the defendants,[104] the motion for summary judgment on this issue should be

12 DENIED.  That is also my recommendation.

13        (vi) Retaliation

14        As elsewhere noted in this report and recommendation, statutory provisions should

15 not be rendered meaningless or otherwise treated as surplusage whenever such result can

16 be reasonably avoided.  See Williams v. Taylor, 529 U.S. at 404; Babbitt v. Sweet Home

17 Chapter of Communities for a Great Or., 515 U.S. at 698; Ratzlaf v. United States, 510

18 U.S. at 140; United States v. Rodríguez, 26 F.3d at 8; United States v. Fontana, 948 F.2d

19 at 803.

20        As defined by subsection (a), discrimination includes, *inter alia,* when a person

21 intimidates, threatens, restrains, coerces, blacklists, and discharges a worker.  29 U.S.C. §

22 1855(b).  AWPA's section 1855(b), however, directs migrant agricultural workers who

23

24  _____

25      [104]There are also two invoices produced by defendant Larry Butner purporting to
    relate to the matter of toilet provision and cleaning.  The name of client and the work
26  descriptions in these documents, however, are seemingly adulterated or otherwise
    unintelligible.  As such, these are not proper supporting evidence in favor of defendant
27  Butner.  See Docket No. 115, Defendants' Memorandum of Summary Judgment, Exhibit
28  43.

CIVIL 97-1589 (JAG)                    58

believe that they have been discriminated by any person covered under the Act to file a complaint with the Secretary of Labor within 180 days. 29 U.S.C. § 1855(b).

Defendants avail themselves of this clear language to contend that plaintiff José Enrique Lugo's claim for retaliation had already expired by the time plaintiffs filed their complaint and should thus be dismissed. Plaintiff nevertheless argues that, not only does section 1855 include no provisions for the exhaustion of administrative remedies, but that section 1854 plainly stipulates that any aggrieved party may file a suit in any United States district court "without regard to exhaustion of any alternative administrative remedies provided [therein]." Yet, the turning point in this matter is that regardless of whether or not plaintiff Lugo should have exhausted the administrative remedies, the pertinent Puerto Rico law, i.e., 29 P.R. Laws Ann. § 69(1)(h), states that a one-year statute of limitations applies in anti-discrimination actions.[105] See Delgado Graulau v. Pegasus Communications of Puerto Rico, 130 F. Supp. 2d 320, 333 (D.P.R. 2001); Olmo v. Young & Rubicam of P.R., Inc., 110 D.P.R. 740 (1981). Thus, the defendants' request for dismissal must prevail. I therefore recommend that plaintiff José Enrique Lugo's claim for retaliation be DISMISSED.

### INJUNCTIVE AND DECLARATORY RELIEF

The defendants argue that plaintiffs do not have standing to seek equitable and declaratory relief. (Docket No. 115.) Specifically, they argue that plaintiffs cannot ask the court to enjoin them from not providing adequate recruitment disclosures, using false and misleading information and failing to comply with their work arrangement with plaintiffs.

---

[105]Title 29 P.R. Laws Ann. § 69(1)(h) states that
[i]t shall be an unfair labor practice for an employer acting individually or in concert with others ... [t]o discharge or otherwise discriminate against an employee because he has filed charges or given information or testimony under the provisions of this subchapter.

CIVIL 97-1589 (JAG)                    59

1
2
3
4   They stress that this action involves facts occurring in 1994, the only year that the
    defendants employed the plaintiffs.
5
6          Plaintiffs argue that they have standing to seek injunctive relief. First, they argue
    that they have suffered injury. Second, they note the causal connection between their
7
    injury and the conduct complained of and third, they argue that it is likely that their injury
8
    will be redressed by a favorable decision.
9
10         I recommend that the defendants' motion to dismiss plaintiffs' claims for declaratory
    and injunctive relief be DENIED. The standing threshold is easily met. <u>Friends of Earth</u>
11
    <u>Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.</u>, 528 U.S. 167, 180-88 (2000). Plaintiffs may have
12
    indeed suffered injury, although such a determination has not been made, and they may
13
    face the threat of future injury due to non-compliance of the North Carolina growers with
14
    federal and state law. Therefore to preclude the possibility of injunctive redress is, at very
15
    least, premature, considering the particular facts of this case, the nature of the seasonal
16
    work involved, and the facility with which the purpose of the implementing statutes could
17
    be circumvented by disallowing the type of injunctive relief which plaintiff seeks, should
18
    they prevail.
19
20         Under the provisions of Rule 510.2, Local Rules, District of Puerto'Rico, any party
    who objects to this report and recommendation must file a written objection thereto with
21
    the Clerk of this Court within thirty (30) days of the party's receipt of this report and
22
    recommendation. The written objections must specifically identify the portion of the
23
    recommendation, or report to which objection is made and the basis for such objections.
24
    Failure to comply with this rule precludes further appellate review. <u>See</u> <u>Thomas v. Arn</u>, 474
25
    U.S. 140, 155 (1985), <u>reh'g denied</u>, 474 U.S. 1111 (1986); <u>Davet v. Maccorone</u>, 973 F.2d
26
    22, 30-31 (1st Cir. 1992); <u>Paterson-Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.</u>,
27
    840 F.2d 985 (1st Cir. 1988); <u>Borden v. Secretary of Health & Human Servs.</u>, 836 F.2d 4,
28

1    CIVIL 97-1589 (JAG)                    60

2

3

6 (1st Cir. 1987); <u>Scott v. Schweiker</u>, 702 F.2d 13, 14 (1st Cir. 1983); <u>United States v.</u>

4

<u>Vega</u>, 678 F.2d 376, 378-79 (1st Cir. 1982); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616

5

F.2d 603 (1st Cir. 1980).

6

At San Juan, Puerto Rico, this 5th day of September, 2001.

7

8

9

JUSTO ARENAS
10                              United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28